## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 16-20069

————

AMMAR ALKHAWALDEH,

Plaintiff - Appellant

v.

DOW CHEMICAL COMPANY,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

March 15, 2017

Lyle W. Cayce
Clerk

————

Appeals from the United States District Court
for the Southern District of Texas

————

Before DAVIS, DENNIS, and SOUTHWICK, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This is a Title VII case that the district court dismissed on summary judgment. For the reasons set out below, we AFFIRM.

## I.

In January 2008, Appellee, Dow Chemical Company ("Dow"), hired Appellant, Ammar Alkhawaldeh, to serve as a Functional Scientist/Functional Leader ("FS/FL") in Dow's Epoxy Research and Development Group. As Ammar's direct supervisor, Dr. Bruce Hook was responsible for annually evaluating Ammar's performance.

In October 2009, Hook rated Ammar a 1 – the lowest possible rating on Dow's 1–5 scale. Hook also placed Ammar on a Performance Improvement Plan

No. 16-20069

("PIP") in order to determine whether Ammar's performance was capable of rehabilitation.

Ammar vigorously protested his rating to no avail. On April 2, 2010, Ammar filed his first EEOC charge, alleging discrimination in violation of Title VII, 42 U.S.C. § 2000(e) *et seq*. On November 17, 2010, Ammar filed the now-controlling EEOC charge, alleging discrimination *and* retaliation in violation of Title VII.

> In November 2009, I reported to human resources that a trainer made offensive remarks to me because I am of Arab descent, dark skinned and/or from Jordan, and that he failed to accommodate my dietary restrictions. When my manger, Bruce Hooks, heard that I complained to human resources, he became angry, made offensive remarks to me and later told another employee that he (Mr. Hooks) wanted me to leave Dow. I was subjected to retaliation in multiple forms for engaging in protected conduct, including but not limited to placing me on a "performance improvement plan" when it was not merited. Company management also blocked me from transferring to another position with the company that would not require me to work for the managers I complained about. I successfully completed the performance improvement plan, but I was still not permitted to transfer to another position within the company; I was terminated by the company without justification, with effect October 31, 2010.

After exhausting all administrative remedies,[1] Ammar sued Dow alleging discrimination and retaliation in violation of Title VII. Dow subsequently filed a motion for summary judgment, which the district court granted on December 31, 2015. We have jurisdiction to decide this appeal pursuant to 28 U.S.C. § 1291.

---

[1] The Equal Employment Opportunity Commission ("EEOC") ultimately issued a Letter of Determination finding that Dow retaliated against Ammar in violation of Title VII. The district court's decision not to address this letter in its ruling was not in error. *See Price v. Fed. Exp. Corp.*, 283 F.3d 715, 725 (5th Cir. 2002) (distinguishing an EEOC investigative report, which the district court must consider, from an EEOC letter, which the district court is free to ignore).

No. 16-20069

## II.

We review a district court's grant of summary judgment *de novo*, viewing all facts and drawing all inferences in a light most favorable to the non-moving party.[2] Summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] "On appeal we may affirm a grant of summary judgment on any legal ground raised below, even if it was not the basis for the district court's decision."[4] Where, as here, "the burden at trial rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case."[5]

## III.

## A.

Ammar's Title VII claim relies entirely on circumstantial evidence, and is therefore subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Pursuant to this framework, the initial burden rests with the employee to produce evidence that he: (1) is a member of a protected class, (2) was qualified for the position that he held, (3) was subject to an adverse employment action, and (4) was treated less favorably than others similarly situated outside of his protected class.[6] This constitutes the employee's prima facie case. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.[7] If the employer is able to articulate a legitimate, non-

---

[2] *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016).

[3] Fed. R. Civ. P. 56(a).

[4] *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010) (quoting *Performance Autoplex II Ltd. v. Mid–Continent Cas. Co.*, 322 F.3d 847, 853 (5th Cir.2003)).

[5] *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

[6] *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).

[7] *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000).

No. 16-20069

discriminatory reason for the adverse employment action, the burden shifts back to the employee to "demonstrate that the" employer's proffered reason is a "pretext for discrimination."[8]

Ammar has failed to produce any evidence that he was treated less favorably than others "similarly situated" outside of his protected class. Therefore, his Title VII discrimination claim fails as a matter of law.

The "similarly situated" prong requires a Title VII claimant to identify at least one coworker outside of his protected class who was treated more favorably "under nearly identical circumstances."[9] This coworker, known as a comparator, must hold the "same job" or hold the same job responsibilities as the Title VII claimant; must "share[] the same supervisor or" have his "employment status determined by the same person" as the Title VII claimant; and must have a history of "violations" or "infringements" similar to that of the Title VII claimant.

Ammar identifies himself as a Muslim Jordanian Arab FS/FL in Dow's Epoxy Research and Development Group. Therefore, in order for Ammar to satisfy the "similarly situated" prong, he must identify at least one non-Muslim Jordanian Arab FS/FL in Dow's Epoxy Research and Development Group who received a 1 rating, as he did, and who completed a PIP, as he did, but who was not fired, as he was.[10]

Ammar has failed to identify a single non-Jordanian Muslim Arab FS/FL in Dow's Epoxy Research and Development Group. This alone justifies dismissal of his Title VII claim. It is well-established that a Title VII claimant can only prove disparate treatment by presenting evidence that he was treated

---

[8] *Ibid.*

[9] *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

[10] Lest there be any doubt, the Title VII comparator must be similarly situated – not identical.

No. 16-20069

less favorably than others *outside of his protected class*.[11] "Title VII was enacted to prohibit discrimination on the basis of race, gender, and other legislatively enumerated grounds."[12] It was not enacted to promote "general fairness in the workplace, or . . . to protect against" the indiscriminate firing of employees.[13]

Ammar has also failed to identify a single FS/FL who received a 1 rating, as he did, and who completed a PIP, as he did, but who was not fired, as he was. In fact, Ammar admits that no such comparator exists. He affirmatively states that he was the only Dow employee to receive a 1 rating in 2009, and he was the only FS/FL to be placed on a PIP throughout his entire tenure at Dow. Ammar therefore cannot prove that he was treated less favorably than others "similarly situated" outside of his protected class.

**B.**

Under our Title VII retaliation framework, the initial burden rests with the employee to produce evidence: (1) that he participated in an activity protected by Title VII, (2) that his employer took an adverse employment action against him, and (3) that there is a causal connection between the adverse employment action and the protected activity.[14] This establishes the employee's prima facie case, and gives "rise to an inference of retaliation."[15] The burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action.[16] Once the employer articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to "demonstrate that the

---

[11] *See Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 409 (5th Cir. 2016).

[12] *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 262 (4th Cir. 2008).

[13] *Ibid.*

[14] *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999).

[15] *Ibid.*

[16] *Ibid.*

No. 16-20069

employer's [stated] reason is actually a pretext for retaliation."[17] In order to demonstrate pretext sufficient to defeat a motion for summary judgment, an employee must produce evidence that could lead a reasonable fact-finder to conclude that "the adverse [employment] action would not have occurred 'but for'" the employee's decision to engage in an activity protected by Title VII.[18]

Dow told the EEOC that it fired[19] Ammar because of "his poor performance in 2009 and his failure to complete a Performance Improvement Plan" in 2010. Ammar, however, claims that Dow's stated reason is "inconsistent" with the sworn testimony of numerous Dow employees, who have testified that Ammar did, in fact, complete the PIP in 2010 and that in order to complete the PIP, a Dow employee must be performing at a satisfactory level. Ammar suggests that this alleged inconsistency *necessarily* raises a genuine dispute of material fact as to the issue of pretext. For the following reasons, we disagree.

We have held that a court *may* infer pretext where an employer "has provided inconsistent or conflicting explanations for its conduct."[20] We have also, however, held that a court deciding a motion for summary judgment in a Title VII case should consider "numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's

---

[17] *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 389 (5th Cir. 2007)).

[18] *Ibid.* (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)).

[19] Dow's firing of Ammar is the only "adverse employment action" actionable under Title VII. *See Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 373 n.11 (5th Cir. 1998) (noting that a negative performance evaluation does not constitute "an adverse employment action actionable under Title VII"); *Cannon v. St. Paul Fire & Marine Ins. Co.*, No. CIV.A. 3:03CV2911-N, 2005 WL 1107372, at *3 (N.D. Tex. May 6, 2005) (holding that placing an "employee in a remedial program" does not constitute an "adverse employment action" actionable under Title VII).

[20] *Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589, 594 (5th Cir. 2007).

case."[21] The ultimate question is not one of pretext, but whether a reasonable fact-finder could conclude that the employer would not have fired the employee "but for" the employee's decision to engage in an activity protected by Title VII.[22]

Ammar alleges he engaged in "protected activity" for the first time in November 2009, when he reported to his then-manager, Hook, that two Dow employees made what he interpreted to be racially insensitive remarks at a Dow training session.[23] One allegedly joked, after Ammar won a briefcase in a Dow raffle, that he could fill it with ten million dollars cash, ten kilograms of cocaine, or an assault rifle, which Ammar took to be an insult to his Muslim heritage. The other allegedly chastised Ammar for arriving fifteen minutes late to a post-lunch meeting. When Ammar attempted to explain that he was late because he, unlike his coworkers, had to go out to eat, the Dow employee

---

[21] *Price*, 283 F.3d at 720 (internal quotations omitted).

[22] *See Feist*, 730 F.3d at 454 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).

[23] Protected activities under Title VII "fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)). We assume without deciding that Ammar's November 2009 conversation with Hook constitutes opposition activity such that it warrants "protection under Title VII." *See id.* at 260 (citing *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) ("The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures.")). We note, however, that Dow did not terminate Ammar until October 30, 2010, which in and of itself raises serious temporal-proximity concerns. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing circuit case law holding three- and four-month periods to be insufficient); *see also Barkley v. Singing River Elec. Power Ass'n*, 433 Fed. Appx. 254, 260 (5th Cir. 2011) (unpublished) (holding that a "four-month gap in time, standing alone, is insufficient to establish prima facie evidence of causation").

Ammar alleges that he repeatedly engaged in protected activity from November 2009 to June 2010. But a Title VII claimant cannot, with each protected activity, re-start "the temporal-proximity clock." *See Hanks v. Shinseki*, No. 3:08-1594-G, 2010 WL 3000835, at *7 (N.D. Tex. July 28, 2010); *see also Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 487 (5th Cir. 2008) (noting that "temporal proximity standing alone is insufficient to establish an issue of fact as to pretext").

asserted that it was "not his problem" that Ammar, as a Muslim, could not eat the provided lunch. When Ammar reported these remarks to Hook, Hook threw a piece of paper at him and told him, "Ammar," when you come from the part of the world that you come from, "there's a perception, and perception is reality."

Even assuming the veracity of Ammar's claims, no reasonable fact-finder could conclude that Ammar would not have been fired but for his November 2009 conversation with Hook. Hook gave Ammar the now-contested 1 rating in October 2009 – one month *before* Ammar's alleged conversation with Hook took place. It was also Hook who, just months earlier, helped Ammar successfully appeal the Immigration and Naturalization Service's ("INS") denial of his O-1 visa, which effectively ensured that Ammar was allowed to remain in the United States. In an email addressed to Hook at the time, Ammar wrote:

> Bruce,
>
> I am not sure where or how to start but I just want to express my profound gratitude to you for the tremendous support I received from you . . . . [I] will never forget your support and kindness for the rest of my life. You[r support of me] showed great leadership [and] character[,] but what is more important in my view is the true and genuine person [that] you are.
>
> Thank you so much,
>
> Ammar

All parties, nonetheless, agree that by the summer of 2010, Ammar needed to be transferred out of Hook's group. Ammar had bypassed corporate channels and sent an email to the Chairman and CEO of Dow claiming that he was the victim of retaliation. He believed that everything that Hook did was in furtherance of Hook's "racist agenda." He complained that the PIP deadlines that Hook imposed were unreasonable. He alleged that Hook could not be

trusted to impartially preside over his evaluation. And his animus towards Hook was beginning to affect "others on the team."

Accordingly, on July 6, 2010, Dow transferred Ammar to a new group and placed him under the direct supervision of David West. Ammar alleges that at this point, his PIP was complete which, pursuant to corporate policy, meant that Dow considered him to be a satisfactory employee. Dow, on the other hand, asserts that Ammar's PIP was terminated rather than completed as alleged.

We resolve this genuine dispute of material fact in Ammar's favor but find that it makes no difference, primarily because Ammar was not terminated on July 6, 2010. Dow, on that date, merely transferred Ammar to West's group, where West evaluated him for approximately two months before concluding, like Hook, that Ammar was an under-performing employee whose deficiencies were beyond repair.

> [D]uring the [two months that I worked with Ammar], I was looking for, you know, some good evidence that I . . . just had incomplete knowledge or only secondhand knowledge or whatever, and I was looking for – I was looking for any signs . . . that he was going to be a good fit in my group or that, you know, perhaps he might have some role if not in the process research side, elsewhere in the group, and I didn't find any evidence of that.

Dow ultimately, pursuant to corporate policy, convened a committee to evaluate Ammar's performance. The committee found that:

> On numerous times, Ammar seemed insubordinate.
>
> He tended to spend more time writing letters and not concentrating on his work.
>
> He does not seem to bring the innovative attribute to the job.
>
> During [the] past 12 monthly innovation meetings, the expectation is that FSFL research employees will write at least 2 patent disclosures per year. This means that Ammar should have at least 4 or 5. Today, he has one, while others with his same length of employment have upwards of 8 or more.

No. 16-20069

He does not seem to posses[s] basic engineering skills.

He does not seem to possess basic mathematical skills for engineers.

Based upon feedback from technical team members and his leaders, his relative performance is tracking towards segment "1" again for 2010.

Dow officially terminated Ammar on October 30, 2010.

We find that, in light of all of this evidence, no reasonable fact-finder could conclude that Ammar would not have been fired but for his decision to engage in activity protected by Title VII. Poor performance is not an activity protected by Title VII. Even assuming that Ammar completed the PIP, West's negative, post-PIP evaluation independently justifies Ammar's termination. The "but for" standard represents a "high burden" that Ammar cannot meet and has not met.[24]

## IV.

The judgement of the district court is AFFIRMED.

---

[24] *See THI-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 995 (9th Cir. 1980) (quoting *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279 (9th Cir. 1976)).