# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 16, 2025

Lyle W. Cayce
Clerk

No. 21-30716

Dominique K. Wilkerson,

*Plaintiff—Appellant*,

*versus*

Jefferson Parish; Roy Juncker, *Director Department of Juvenile Services*; Christopher Trosclair, *Assistant Director DJS*; Unidentified Party,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-3031

Before Wiener, Richman, and Willett, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:*

Dominique Wilkerson worked for the Jefferson Parish Department of Juvenile Services (DJS) for six months as a supervisor on probationary status at the Rivarde Juvenile Detention Center (Rivarde). Wilkerson's performance was rated "below expectations," the lowest rating available, and her employment was terminated. Wilkerson filed claims of sex and race

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 21-30716

discrimination and retaliation against Jefferson Parish under Title VII of the Civil Rights Act of 1964. Jefferson Parish filed a motion for summary judgment. The district court granted the motion. We affirm.

## I

On summary judgment, this court views "the evidence in the light most favorable to the non-moving party."[1] Accordingly, our statement of the facts recounts that evidence.

Wilkerson worked for DJS for six months as a supervisor on probationary status at Rivarde. DJS rules require that an employee be probationary immediately following his or her appointment to a position. When Wilkerson was applying to work at DJS, assistant director Christopher Trosclair conducted her first interview. Trosclair recommended Wilkerson to director Roy Juncker, who was ultimately responsible for making employment decisions. Juncker interviewed Wilkerson and hired her.

Wilkerson was assigned to work the overnight shift that began at midnight. About five months into her employment, Wilkerson emailed Trosclair to inform him that she had given detention officer Daniell Bailey two verbal warnings for sleeping on the job. Trosclair requested that Wilkerson detail the time and date of each instance that she had discovered Bailey sleeping. Wilkerson conceded that she did not know the exact days, and Trosclair reminded her of her duty to document verbal warnings.

That same month, Trosclair made a surprise visit to Rivarde at 3:00 a.m. Wilkerson and Brishawna Silby were on duty as supervisors at the time. Trosclair said that during this visit, he found two detention officers, Bailey and Jacqueline Taylor, asleep. He also saw Silby sleeping in the supervisors'

---

[1] *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 323 (5th Cir. 2002).

2

office where Wilkerson was working. Bailey and Taylor admitted to sleeping. Silby claimed that she may have dozed off but did not fall asleep. Wilkerson said that she was speaking to Silby and did not think that she was sleeping.

About a week later, Juncker completed a form to extend Wilkerson's probationary period. DJS rules require that the employee receive a copy of a request for a probation extension. If DJS fails to provide the employee a copy of the extension, the rules state that such failure "shall have the same force and effect as a satisfactory report." Juncker did not provide a copy of the extension to Wilkerson and did not know if anyone ever gave her a copy of the form.

In the sixth month of Wilkerson's employment, Trosclair completed Wilkerson's probationary employee performance evaluation. Her overall rating was "below expectations," the lowest rating available. She received a score of "0" (below expectations) for safety, a score of "1" (needs improvement) for communication, a score of "1" for decision-making, and a score of "0" for supervision and management. The evaluation gave several reasons for the ratings. It noted that the January 2020 surprise visit formed part of the basis for Wilkerson's rating. Silby also stated that Wilkerson would regularly sleep on duty during at least one of three shifts they worked together every week. Wilkerson, however, testified that though she would occasionally "zon[e] out" or "doze" while remaining "alert," she "never slept on the job." Viewing the evidence in the light most favorable to Wilkerson, we will assume that she did not sleep on the job but did "doz[e] off" for "a few seconds" "every shift or so," as she admitted. A detention officer on Wilkerson's shift further stated that Wilkerson and her co-supervisor would spend extended periods in their office, often with the door closed and lights out.

In addition to the allegations regarding sleeping, the evaluation noted that cameras showed that on the night of Trosclair's surprise visit, Wilkerson did not make her first supervisory round until about 4:20 a.m., even though she arrived at 11:56 p.m. Wilkerson testified, however, that she did rounds at midnight that night and that Silby did rounds at 1:45 a.m., so the supervisors had completed two sets of rounds before Trosclair arrived. Viewing the facts in the light most favorable to Wilkerson, we will assume that she completed her rounds earlier than the evaluation described. The evaluation further noted that Wilkerson "failed to document properly the incident and decisions related to an employee that she caught sleeping on duty. By her own admission, she failed to ensure that verbal warnings were documented and did not perform Coaching & Counseling Sessions when appropriate." Additionally, the evaluation categorized Wilkerson as "disorganized and often in crisis due to lack of planning and organizing."

Wilkerson had a pre-disciplinary hearing and meeting with Juncker due to her evaluation. Juncker's testimony about the meeting suggested his belief that the explanations Wilkerson offered for her missteps were inconsistent, that she made excuses, and that she failed to take responsibility for her actions. However, the district court noted that in the pre-disciplinary hearing, Wilkerson acknowledged that she and Silby "might not have done that many rounds. I'll take my lick." Viewing the facts in the light most favorable to Wilkerson, this concession shows that she took responsibility for at least some of her alleged mistakes.

A few days later, Wilkerson sent an email to Juncker in which she stated that Trosclair was "arrogant, egotistical and very disrespectful . . . especially pertaining to women" and that he treated her and Silby "differently than he [treated] [their] supposed to be equal male supervisors." Two days after that, Juncker terminated Wilkerson's probationary employment.

No. 21-30716

Wilkerson filed claims of sex and race discrimination and retaliation against Jefferson Parish under 42 U.S.C. §§ 2000e *et seq.* and state law. She also asserted a claim of race discrimination under 42 U.S.C. § 1981 against Jefferson Parish and against Juncker and Trosclair in their official capacities. The district court dismissed the official-capacity claims against Trosclair and Juncker. Jefferson Parish, the only remaining defendant, then moved for summary judgment. The district court granted the motion and dismissed Wilkerson's claims with prejudice. Wilkerson appeals the dismissal of her Title VII claims. "This court reviews a grant of summary judgment de novo, applying the same standards as the district court."[2]

## II

We conclude that Wilkerson failed to establish a prima facie case of discrimination based on gender or race. Wilkerson's proffered employees are not proper comparators.

Courts use the *McDonnell Douglas*[3] framework to analyze employment-discrimination claims that are based principally on circumstantial evidence.[4] "*McDonnell Douglas* and subsequent decisions have 'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.'"[5] "First, the plaintiff must establish a prima facie case of discrimination."[6] If the

---

[2] *Id.* (italics omitted).

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[4] *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141-42 (2000); *see also McDonnell Douglas Corp.*, 411 U.S. at 800-06 (explaining "the order and allocation of proof in a private, non-class action challenging employment discrimination").

[5] *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

[6] *Id.*

plaintiff establishes a prima facie case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions.[7]  Once the defendant produces evidence of a nondiscriminatory explanation for its decision, the plaintiff is afforded the opportunity to prove by a preponderance of the evidence that the reasons offered were not the defendant's true reasons but rather were a pretext for discrimination.[8]

To survive summary judgment, the plaintiff must show

that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.[9]

"The 'similarly situated' prong requires a Title VII claimant to identify at least one coworker outside of his protected class who was treated more favorably 'under nearly identical circumstances.'"[10]  This coworker, also referred to as a comparator, must "hold the 'same job' or hold the same job responsibilities as the Title VII claimant; must 'share[] the same supervisor or' have his 'employment status determined by the same person' as the Title VII claimant; and must have a history of 'violations' or 'infringements' similar" to the Title VII claimant's history.[11]  "[T]he

---

[7] *Id.*

[8] *Id.* at 143.

[9] *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (per curiam), *abrogated in part on other grounds by Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) (en banc).

[10] *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)).

[11] *Id.*

plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions."[12] "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis."[13]

The parties agree that Wilkerson, an African American woman, is a member of two protected classes; that she was qualified for her position; and that her termination was an adverse employment action. Wilkerson names four employees outside her protected classes that she alleges are similarly situated: Christopher Bruno, Stanley LeBlanc, Lynn Shields, and Violet Troulliet. None of these employees are sufficiently comparable.

Christopher Bruno's employment record was quite different from Wilkerson's. He had worked at DJS for at least twenty years;[14] Juncker

---

[12] *Lee*, 574 F.3d at 260 (quoting *Perez v. Tex. Dep't of Crim. Just.*, 395 F.3d 206, 213 (5th Cir. 2004)).

[13] *Id.* (alteration in original) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).

[14] *See Kendall v. Block*, 821 F.2d 1142, 1147 (5th Cir. 1987) (concluding two employees at different levels of seniority and with different overall performance ratings were not similarly situated); *see also Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 88 (5th Cir. 2019) (per curiam) (holding that a reasonable jury could conclude that "an employer could properly scrutinize an introductory employee closer than a longer-term 'permanent' employee and be inclined to view a violation by an introductory employee more seriously"); *Sartor v. Spherion Corp.*, 388 F.3d 275, 279 (7th Cir. 2004) (concluding that the plaintiff failed to bring forward evidence of a similarly situated employee because there were "substantial differences in experience" between the plaintiff and an employee offered as a comparator); *Campbell v. Hamilton County*, 23 F. App'x 318, 325 (6th Cir. 2001) (per curiam) ("Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated.").

testified that Bruno admitted to the conduct at issue and generally took responsibility for his actions, while Wilkerson only took responsibility for some of her alleged missteps; Bruno received a higher score in safety, which is "of paramount importance within detention"; and there were no allegations of anyone sleeping under his supervision.

As for Stanley LeBlanc, unlike Wilkerson, he was a permanent employee. This court and several other circuits have determined that probationary employees are not similarly situated to permanent employees.[15] As the Seventh Circuit has stated, "It is fundamental that . . . the plaintiff . . . show that the 'comparables' are similarly situated *in all respects*."[16] Probationary employees are by definition different from permanent employees.[17]

Lynn Shields received a "0" in her evaluation for attendance due to habitual tardiness, but she had no "unacceptable safety violations." Shields also received higher scores than Wilkerson in communication, decision-making, and supervision and management. Safety is of "paramount importance." Being late is not "comparabl[y] serious[]" to sleeping, dozing, or allowing others to sleep or doze on the job.[18]

---

[15] *See, e.g.*, *Thomas v. Johnson*, 788 F.3d 177, 180 (5th Cir. 2015) (collecting cases).

[16] *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (holding that the plaintiff and a nondisabled employee were not similarly situated "in all respects" when analyzing a claim of discrimination based on disability).

[17] *See Shea v. Mgmt. & Training Corp.*, No. 1:18-CV-00830, 2021 WL 4037600, at *1 (W.D. Tex. Aug. 26, 2021) ("Probationary employees and permanent employees are not similarly situated due to the different nature of their employment.").

[18] *See Lee*, 574 F.3d at 261 ("[T]he similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out . . . ." (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976))).

No. 21-30716

Violet Troulliet retired after working for the Parish for almost twenty-three years.[19]  She was a permanent employee,[20] and there were no allegations that she created safety issues by allowing the officers she supervised to sleep on the job, that she slept or dozed on the job, or that she failed to notice, correct, or report employees or fellow supervisors sleeping on the job.[21]

The district court did not err in concluding that Wilkerson failed to establish a prima facie case of discrimination based on gender or race.

## III

Wilkerson also alleged retaliation "for voicing her opposition by complaining to her supervisors of discriminatory conduct."  Her retaliation claim fails because she did not offer evidence of pretext.

"A Title VII retaliation plaintiff must establish that: '(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action.'"[22] "This establishes the employee's prima facie case, and gives 'rise to an inference of retaliation,'" and "[t]he burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment

---

[19] *See Wallace*, 777 F. App'x at 88.

[20] *See Thomas*, 788 F.3d at 180-81.

[21] *See Lee*, 574 F.3d at 260 ("[T]he plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." (quoting *Perez v. Tex. Dep't of Crim. Just.*, 395 F.3d 206, 213 (5th Cir. 2004))).

[22] *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) (quoting *Thomas v. Tex. Dep't of Crim. Just.*, 220 F.3d 389, 394 (5th Cir. 2000), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

action."[23] Once the employer articulates a legitimate, nonretaliatory reason for its action, the burden shifts back to the employee to show that the stated reason "is actually a pretext for retaliation."[24] To demonstrate pretext, the employee must produce evidence "that could lead a reasonable fact-finder to conclude that 'the adverse [employment] action would not have occurred "but for"' the employee's decision to engage in an activity protected by Title VII."[25] "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence."[26]

The district court determined that Wilkerson established one instance of activity protected by Title VII. Wilkerson presented a prima facie case of retaliation based on her February 17 email to Juncker in which she complained that Trosclair was "arrogant, egotistical and very disrespectful" in the way that he interacted with women and that he treated her and Silby differently than he treated male supervisors. The court determined that she linked her complaints about Trosclair's behavior to her protected status as a woman, she suffered an adverse employment action, and she offered sufficient evidence of a causal link between the email and her termination. But the court concluded that Jefferson Parish offered legitimate reasons for

---

[23] *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999), *abrogated in part on other grounds by Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023) (en banc)).

[24] *Id.* (quoting *Feist v. La., Dep't of Just., Off. of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013)).

[25] *Id.* (quoting *Feist*, 730 F.3d at 454).

[26] *Harville v. City of Houston*, 945 F.3d 870, 879 (5th Cir. 2019) (alteration in original) (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)).

No. 21-30716

Wilkerson's termination, and Wilkerson failed to offer evidence of pretext for retaliation. We agree.

Wilkerson emphasizes a comment by Juncker in which he stated:

Ms. Wilkerson was . . . not a good fit for our agency. . . . [because] [s]he said that everybody was against her and . . . felt like everybody was against her, and why would I want to keep somebody in a position where she felt like people were retaliating against her, where there was no proof that anybody was retaliating against her . . . ?

She also argues that Juncker extended her probationary period because if she was a permanent employee at the time of her evaluation, she could only be fired for cause. All of Wilkerson's arguments constitute speculation as to Juncker's intentions.[27] This speculation could not lead a reasonable fact finder to conclude that the adverse employment action would not have occurred but for Wilkerson's email.[28] The district court did not err in dismissing her retaliation claim.

\* \* \*

The judgment of the district court is AFFIRMED.

---

[27] *See Septimus v. Univ. of Hous.*, 399 F.3d 601, 611 (5th Cir. 2005) ("All of this evidence amounts to mere speculation that [the employer] retaliated against [the plaintiff] . . . . The district court properly entered summary judgment on this claim.").

[28] *See Alkhawaldeh*, 851 F.3d at 427.

11