**Opinion issued September 17, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00712-CV

———————————

**ERNEST POLK, Appellant**

**V.**

**TEXAS OFFICE OF CONSUMER CREDIT COMMISSIONER, Appellee**

On Appeal from the 281st District Court
Harris County, Texas
Trial Court Case No. 2018-04375

## MEMORANDUM OPINION

The Texas Office of Consumer Credit Commissioner ("OCCC") terminated Plaintiff Ernest Polk from his position as a state financial examiner after discovering Polk was using his official credit card for personal use. Polk sued OCCC for discrimination and retaliation and OCCC filed a Plea to the Jurisdiction. Polk

appeals from the trial court's judgment granting OCCC's Plea to the Jurisdiction and dismissing his claims.

We affirm the trial court's judgment.

**Background**

The OCCC is a state agency that regulates consumer lenders, such as payday lenders and pawn shops. In January 2014, OCCC hired Appellant Ernest Polk for the position of Financial Examiner I. As a financial examiner, Polk was required to apply for and obtain a credit card to be used exclusively for business travel expenses. Polk, who is African American, worked out of OCCC's Houston office, where most of the financial examiners were African American. According to Polk, many of the African American examiners complained about racial discrimination and most African American examiners left the Houston office within a short time.

Financial examiners are tested after their initial examiner training and during examiner training conferences throughout the year. On April 30, 2015, Polk received his first annual performance evaluation. His supervisor, Gene Dow, stated in the evaluation that although Polk had passed his initial examiner training test on his second attempt, Polk needed to "pass all future tests on the first try in order to be considered for promotions."

Polk alleges that even though he became eligible for consideration for promotion to Financial Examiner II in May 2015, Dow did not recommend him for

2

the promotion at that time. OCCC contends that a supervisor recommendation is one of the requirements for promotion. According to Polk, while the promotions of eligible African American examiners often were delayed, eligible White examiners in other offices were promoted on schedule. Polk alleges that "late grade promotions" were a common complaint among OCCC's African American examiners. Polk alleges that at a regional meeting in the summer or fall of 2015, he and other African American examiners complained about the late grade promotion issue, and Polk told OCCC that there appeared to be a racial difference. According to Polk, OCCC did nothing to address their concerns.

Polk was promoted to the position of Financial Examiner II in November 2015, after Dow recommended him for the promotion. After his promotion, Polk requested six months of back pay because of the six-month delay in his promotion, but OCCC refused his request.

On February 17, 2016, Polk filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC") asserting a claim for race discrimination and retaliation. He alleged that even though he was qualified for a promotion in May 2015, OCCC had delayed his promotion to Financial Examiner II until November 2015 due to his race. After he filed his charge of discrimination, Polk alleges he experienced regular instances of "petty harassment," including OCCC, abruptly and without explanation,

deciding not to include him in an "employee spotlight." He claims that his supervisors also challenged his decision to change hotels during work travel. Polk alleges he told his supervisor he had changed hotels because his original hotel was "in an area known for racial discrimination" and he had witnessed people using racial slurs there. Nonetheless, he was required to write "exception safety community conditions" on his travel vouchers. According to Polk, he also protested a racially insensitive topic included in an OCCC newsletter, and although the discussion was initially removed, it was added back in and left there for three months.

On June 7, 2016, Polk, who was represented by counsel, mediated the EEOC case with Juan Garcia, OCCC's Director of Strategic Communications, Administration and Planning, and OCCC's General Counsel, but the case did not settle. On July 7, 2016, after the failed mediation, OCCC filed a position statement with the EEOC.

In September 2017, Polk alleges he spoke to OCCC's Commissioner Leslie Pettijohn and OCCC's Director of Consumer Protection Rudy Aguilar during an examiners' meeting. He alleges he told them about "the racism, the high turnover that the racism caused with black OCCC examiners, and the denial of promotions of black examiners by the OCCC." Shortly after, in October 2017, the EEOC issued Polk a right to sue letter. One month later, in November 2017, Polk received an

4

"average" evaluation which he alleges was retaliatory because it did not reflect the quality of his work performance.

On November 29, 2017, Polk met with his supervisor, Greg Williams.[1] According to Polk, he raised the racial issues during the meeting and he told Williams that OCCC would have a hard time retaining African American examiners if the issues continued.

On December 14, 2017, OCCC met with Polk to discuss its recent discovery that Polk had been using his credit card to purchase gasoline for personal use, including while Polk was on vacation. That day, Polk met with Williams, Garcia, Aguilar, and OCCC's General Counsel. When Garcia asked Polk if he had used his travel credit card for personal use, Polk answered that he had "because it's impossible not to use it for personal use when you submit a travel voucher for personal reimbursement, it's called personal mileage reimbursement." Garcia fired Polk immediately. Polk complained to the meeting participants that OCCC was retaliating against him, and that retaliation was the only reason they were firing him.

Polk filed a second charge of discrimination on May 2, 2018, alleging OCCC had terminated his employment in retaliation for "rais[ing] previous concerns about

---

[1] Dow was Polk's supervisor from January 2014 to November 2015. When Dow retired in January 2016, Greg Williams was promoted to Dow's position, and he became Polk's supervisor. Williams supervised Polk from January 2016 until Polk's termination in December 2017.

racial discrimination and because [he] filed a charge of discrimination with the EEOC."

## OCCC's Plea to the Jurisdiction[2]

Polk sued OCCC for wrongful termination based on race discrimination and retaliation, failure to promote based on racial discrimination, and hostile work environment based on racial harassment. OCCC filed a Plea to the Jurisdiction seeking dismissal of Polk's claims. OCCC argued that Polk could not establish a

---

[2] OCCC filed two Pleas to the Jurisdiction. The arguments OCCC raised in its first and second Pleas and Polk's responses are largely the same. The evidentiary support varies, as discussed below.

After OCCC filed its first Plea to the Jurisdiction, Polk moved to supplement his disclosures to add Crystal Thompson-Hill, a former employee of OCCC, as a witness and he submitted Thompson-Hill's declaration in support of his response to OCCC's first Plea. OCCC objected to Polk supplementing his discovery responses and moved to strike Thompson-Hill's declaration. The trial court granted Polk's motion for leave to supplement his discovery responses and, after considering the evidence, including Thompson-Hill's declaration, the trial court denied OCCC's first Plea.

After several unsuccessful attempts to depose Thompson-Hill, OCCC filed a motion to strike Thompson-Hill's declaration and a second Plea to the Jurisdiction in which OCCC raised the same arguments it had raised in its first Plea. Polk filed a response arguing that OCCC's second Plea, which he claimed was untimely, was largely identical to its first Plea and Polk attached, among other things, his response to OCCC's first Plea and its exhibits.

The trial court denied OCCC's motion to strike Thompson-Hill's declaration because the parties had agreed to work together to obtain Thompson-Hill's deposition testimony. After Thompson-Hill was deposed, OCCC filed a supplement to its second Plea and attached excerpts of Thompson-Hill's deposition. Polk filed a supplemental response to OCCC's second Plea and attached additional excerpts of Thompson-Hill's deposition. After considering the evidence, including Thompson-Hill's declaration and deposition testimony, the trial court granted OCCC's second Plea to the Jurisdiction.

prima facie case for his claim of failure to promote based on race discrimination because OCCC had promoted him to Financial Examiner II as soon as he was qualified for the position. And even if Polk could meet his prima facie case, Polk could not establish that OCCC's reasons for promoting him in November 2015, instead of May 2015, were a pretext for discrimination because the evidence reflects that based on Polk's history of failing test scores, Polk's supervisor was not sure Polk could handle the complex, intricate calculations necessary for a Financial Examiner II to complete his work. For that reason, Polk's supervisor did not recommend him for a promotion in May 2015.

With respect to Polk's wrongful termination claim based on retaliation, OCCC argued that Polk could not establish a prima facie case because there was no evidence establishing a causal link between Polk's charge of discrimination filed in February 2016 and his December 2017 termination. And even if he could establish his prima facie case, OCCC argued Polk could not establish that OCCC's reason for terminating his employment was a pretext for discrimination.

OCCC further argued that to the extent Polk was attempting to litigate other claims, such as wrongful termination based on racial discrimination or hostile work environment, such claims were barred because Polk had not raised those claims in his charges of discrimination, and thus he had not exhausted his administrative remedies. *See* TEX. LAB. CODE §§ 21.201, 21.252–.254 (stating that filing charge of

7

discrimination is prerequisite to suing employer for claim). And in any event, Polk's allegations of "petty harassment" were insufficient to support a hostile work environment claim.

In support of its Plea to the Jurisdiction, OCCC attached, among other things, an affidavit from OCCC's Human Resources Officer Candace Vargas,[3] an affidavit from OCCC's Supervising Financial Examiner Christine Graham, and excerpts from Polk's deposition transcript. Vargas explained in her affidavit that to be promoted to a Financial Examiner II, a Financial Examiner I must (1) successfully complete his initial examiner training; (2) have one year of "experience in conducting basic examinations, counted from the date of submission of the examiner's first independent report," (3) have an overall rating of "satisfactory or better" on his most recent evaluation; and (4) have a recommendation for consideration for promotion from a supervisor and director on Consumer Protection. Vargas stated that in November 2015, Polk's supervisor, Dow, had recommended Polk for promotion to a Financial Examiner II. Vargas also averred that as a financial examiner, Polk had been issued a "credit card to be used for official travel business while performing his job duties" and that use of "this credit card was strictly governed by OCCC's

---

[3]     Candace Vargas attached multiple documents to her affidavit including two memoranda prepared by Gene Dow, Polk's supervisor, an affidavit from OCCC's Supervising Financial Examiner Christine Graham, OCCC's Travel Guidelines and Regulations (Policy # 400), a summary of Polk's reimbursement requests, and OCCC's Standards of Conduct Policy (Policy #509).

Travel Guidelines and Regulations." According to Vargas, in November 2017, "OCCC noticed potential problems with Mr. Polk's travel vouchers and a subsequent investigation revealed that Polk "had been using his official credit card for personal use and that he had submitted reimbursement requests for dozens of expenditures that were not lawfully reimbursable." OCCC "personnel compiled a summary of those illegitimate reimbursement requests" and "confronted Mr. Polk with his credit card misuse and illegitimate reimbursement requests on December 14, 2017." Vargas averred that Polk "refused to answer questions and walked out of the room." On the same day, "OCCC terminated him in accordance with policy."

Attached to Vargas's affidavit were two memoranda prepared in November 2015 by Dow. In Dow's November 3, 2015 memorandum entitled, "Ernest Polk – Assessment of Capabilities at May 16, 2015," Dow explained that on May 16, 2015, Polk became eligible for consideration for promotion to Financial Examiner II. He explained that the "main concerns with going forward with a recommendation for [Polk's] promotion were listed in his Performance Evaluation [of Polk] for the period end[ing] April 30, 2015." Dow stated that based on Polk's past test scores, he was not convinced Polk could handle the "complexity and intricacies of Chapter 348 calculations," which were part of a Financial Examiner II's responsibilities. In Dow's "Promotion Memo for Examiner Ernest Polk — November 4, 2015," Dow stated that Polk was "currently in training for [Chapter] 348 independent work," and

9

Dow believed that Polk would "be able to successfully complete the Chap[ter] 348 training within the next four to six months." Dow concluded by stating, "Based on his completion of all the steps required by the OCCC Career Ladder in effect on November 4, 2015, I am recommending [Polk's] promotion to Financial Examiner II."

OCCC also attached to Vargas's affidavit the OCCC Travel Guidelines and Regulations (Policy #400) and OCCC's Standards of Conduct Policy (Policy #509) in effect while Polk worked at OCCC. As relevant here, OCCC's Travel Guidelines and Regulations state:

> **Corporate Charge Card**
>
> Frequent travelers should contact the accounting office for an application to enroll in the official state travel card program; it is mandatory for employees who qualify to use the card. **The card is to be used only for official state business and must be paid in full and on time each month**.
>
> **The Texas Ethics Commission has determined that a credit card issued to a state employee for state purposes may not be used for personal expenditures or any other type of expenditure not reimbursable as a state business expense under state law**. See the statewide travel charge card policy and the card use agreement for more details. All charge card holders will be required to sign the card use agreement form. The card charges are audited each month for unauthorized charges and past due amounts.

(Second emphasis added). Also relevant here, OCCC's Standards of Conduct Policy states that "violation of the standards set forth" in the Policy "is subject to disciplinary action up to and including termination, as deemed appropriate and

10

necessary." The Policy then outlines "Unacceptable or Prohibited Activities and Employee Conduct," including among them, "[v]iolating any agency rule or any action that is detrimental to the OCCC's efforts to operate effectively and efficiently" and "unauthorized use of OCCC equipment or property for personal reasons. . . ."

Graham also provided an affidavit in support of OCCC's Plea. She stated in her affidavit that Polk had been "issued a credit card to be used for official travel business while performing his job duties" as a Financial Examiner I and based on Graham's review of Polk's records, "including credit card statements, time sheets, and other official records, Mr. Polk [had] used his official credit card for personal use." Graham identified three instances where Polk had used his official credit card for personal use stating:

a. On July 21, 2017, Mr. Polk logged 2 hours of administrative time on his time sheet and 6 hours of vacation time . . . On this date Mr. Polk used his official state credit card at a Walmart in Harahan, Louisiana, which is near New Orleans, Louisiana.

b. On August 25, 2017, Mr. Polk logged 2 hours of administrative time on his timesheet and 6 hours of vacation time. He then was on vacation from August 28, 2017 to August 31, 2017 . . . During this period Mr. Polk used his official state credit card at an HEB in San Antonio, Texas and at an HEB in Kerrville, Texas.

c. From November 20, 2017 to November 24, 2017, Mr. Polk was on vacation or Thanksgiving leave. Neither vacation time nor Thanksgiving leave involve official state business. During this time Mr. Polk used his official state credit card.

11

**Polk's Evidence in Response to OCCC's Plea[4]**

Polk filed a response to OCCC's Plea arguing that OCCC failed to address his claims for wrongful termination based on race discrimination and hostile work environment and the evidence established a prima facie case for wrongful termination based on race discrimination. Polk argued that he established a prima facie case for wrongful termination based on retaliation because the evidence showed a causal connection between his protected activity and his termination. According to Polk, he engaged in protected activities by repeatedly voicing his opposition to racial discrimination and participating in the "EEOC/TWC process" for his February 2016 charge of discrimination. Polk argued that he presented evidence that OCCC's alleged reason for firing him—his alleged credit card misuse—was false and a pretext for retaliation. He argues that the evidence of pretext and the temporal proximity between his termination and his ongoing opposition to race discrimination, which he claimed continued until two weeks before his termination, supported an inference of causation.

With regard to pretext, Polk argued that OCCC's proffered reason for his termination—misuse of his travel credit card—was unworthy of credence because his credit card use did not actually violate OCCC's credit card policy, other financial

---

[4]    Because Polk's responses to OCCC's first and second Pleas to the Jurisdiction are largely the same, we address them together, including Polk's supplemental response to OCCC's second Plea. *See* supra footnote 2.

examiners used their cards in the same way, no one told him he was using his credit card incorrectly, the timing of OCCC's investigation into his travel vouchers and credit card use was suspicious, and the alleged credit card violations were minor and had no financial impact on OCCC. Arguing that OCCC likely knew its proffered reason for his termination was problematic, Polk claimed that OCCC later concocted a second reason for his termination during the course of the litigation, claiming that Polk also had been terminated due to his behavior during the December 14, 2017 meeting. Polk also argued that Vargas's affidavit was inadmissible and thus OCCC had not produced admissible evidence supporting its claim that it terminated Polk because of his conduct during the December 2017 meeting.

As to his failure to promote claim, Polk argued that he established a prima facie case for race discrimination because Dow's recommendation was the only requirement Polk lacked for promotion in May 2015, and Dow withheld the recommendation due to Polk's race. According to Polk, he was otherwise qualified for the promotion to Financial Examiner II in May 2015. Polk further argued that OCCC's explanation for not recommending him for promotion to Financial Examiner II in May 2015 was a pretext for discrimination and that he had presented evidence sufficient to create a fact issue as to pretext because he stated in his declaration that African American examiners complained about racial discrimination, most African American examiners left OCCC in a short time, there

13

was a persistent problem with late grade promotions for African American examiners, and Polk was given vague excuses about not being ready for the position of Financial Examiner II in May 2015.

Polk attached several exhibits to his response to OCCC's Plea to the Jurisdiction, including his declaration and a declaration from Crystal Thompson-Hill—a former employee of OCCC. In his declaration, Polk stated that he started working for OCCC in January 2014 as a Financial Examiner I in the Houston office. Polk and most of the examiners in the Houston office were African American. According to Polk, many of OCCC's African American examiners "complained about racial discrimination, from petty harassment to different treatment" and most of them left OCCC within a short time of going to work for the agency. According to Polk, the African American examiners commonly complained that they were not being promoted to "a higher grade on the regular cycle, but instead [their] promotions would be delayed." Polk stated that he was "fully qualified to be promoted to Examiner II in May 2015" because he had "passed the test and had met all requirements for the promotion." According to Polk, May 2015 was the "expected time for [his] promotion" to Financial Examiner II because he had been a Financial Examiner I for one year. Polk, who was not promoted to Financial Examiner II until November 2015, stated he was "given vague excuses about not

being ready" in May 2015 and "[W]hite examiners in other offices were being promoted on the regular schedule."

In February 2016, Polk filed a charge of discrimination. According to Polk, "there were many incidents of petty harassment and abuse directed at me and the other African American examiners," including OCCC's unexplained decision to not feature Polk in an "employee spotlight." Polk claimed that his supervisors "challenged [his] decision to change hotels in Beaumont" even though he explained that he had witnessed racial slurs at his original hotel which was "in an area known for racial discrimination," and Polk was required to write "exception safety community conditions" on his travel voucher. Polk also stated that he "protested the discussion of 'Texas Heroes' during the Civil War in the OCCC newsletter and explained that it was insensitive to racial discrimination and slavery," but "OCCC put the 'Texas Heroes' section back into the newsletter and left it there for three months."

In July 2017, Polk, who was represented by counsel, mediated the EEOC case, but the case did not settle. The EEOC issued a right to sue letter in late October 2017. Polk claimed that in December 2017, he was "suddenly fired" and his position was filled by a non-African American. He asserted that prior to his termination, no one at OCCC told Polk he was under investigation and although his credit card bill and travel reimbursements were audited every month, no one told him he had been

using his travel credit card incorrectly.  Polk claimed that he used his travel credit card as instructed in training and he had seen other examiners use their cards the same way.

In his deposition,[5] Polk testified that he was told in training that he could use his travel credit card to pay for gasoline and he predominantly used the card to pay for hotel expenses, rental cars, and gasoline for the rental cars and his personal car. Polk stated that he used the credit card when he was not traveling for work because he "would have to gas up for the coming week." Polk testified that he used his travel credit card to purchase gas for his personal car because he might need to use his car for work the following Monday.

Polk also testified that he was asked about his travel vouchers and travel credit card during the December 2017 meeting.  When Garcia asked him if he had used his travel credit card for personal use, Polk answered that he had "because it's impossible not to use it for personal use when you submit a travel voucher for personal reimbursement, it's called personal mileage reimbursement."  Garcia fired Polk immediately.  Polk complained that OCCC was retaliating against him, and that retaliation was the only reason they were firing him.

---

[5]     OCCC also attached to Vargas's affidavit excerpts from Polk's deposition testimony.  This summary of Polk's testimony is from excerpts submitted by OCCC and Polk.

In her declaration, Thompson-Hill stated that she worked as an accountant for OCCC until March 2020, and her responsibilities included reviewing travel expenses for OCCC employees, including Polk. Thompson-Hill stated that examiners normally used rental vehicles and "use[d] their credit cards to buy gasoline for the vehicles," and "most if not all examiners used their credit cards the same way as" Polk. According to Thompson-Hill, OCCC did not have a "requirement that the gasoline be used only for official state business." Thompson-Hill stated that she had been asked to pull Polk's "documentation for some sort of investigation," but no one told her why or asked her "if there was anything unusual or improper about the way that Mr. Polk used his credit card." She was surprised when she later learned that Polk had been terminated "based on his use of the credit card" and she had "never heard of another examiner being disciplined or terminated on this basis."

Later, during her deposition, Thompson-Hill testified that financial examiners were allowed to purchase gasoline with their travel credit cards for "work travel," but not "personal travel." According to Thompson-Hill, "work travel" means "work related for the OCCC." Thompson-Hill testified that she was not aware of any financial examiners who used their travel credit cards for personal travel, and she had never seen evidence of any financial examiners using their credit cards while on vacation. She admitted that she would not know if a financial examiner was using

17

his travel credit card for personal expenses unless the examiner submitted vouchers or reimbursement requests for those expenses.

When asked what she meant when she stated in her declaration that OCCC "had no requirement that the gasoline be used only for official state business," Thompson-Hill testified that she was not sure, but she thought OCCC "required you to be on travel status" and the card was required to be "used only for official state business." According to Thompson-Hill, an employee had to be on travel status to purchase gasoline with his travel credit card if the employee intended to submit the expense for reimbursement. Thompson-Hill testified that, as far she knew, Polk and the other examiners used their travel credit cards only for travel expenses, and she was not aware of them using their travel credit cards for another purpose. Thompson-Hill stated it would be inappropriate for a financial examiner who was not working for several days to use his travel credit card to "fill up [his] tank with gas while []on vacation on a road trip" and she was not aware that any financial examiner had used his travel credit card in that manner.

In its reply, OCCC argued that its position statement, which Polk had attached to his response, demonstrated that Polk's promotion date was not based on race discrimination. OCCC's position statement reflected that Polk was hired as one of five new financial examiners, four of whom were African American, and all five examiners were promoted to Financial Examiner II at different times throughout

18

2015 based on the same criteria. Some of the African American examiners were promoted before Polk. According to OCCC, Polk's declaration only reflected his subjective belief that his promotion was purportedly delayed because of race discrimination, and it did not provide any objective evidence that could support an inference of discrimination.

OCCC also argued that Polk's claim that other examiners used their credit cards like he did, that he was told he could use his card to purchase gas, that he was not told he was using his card incorrectly, and that the identified misuses of his credit card were minor and thus not terminable offenses, were mere attempts to deflect from the undisputed evidence that Polk's use of his credit card violated OCCC's written credit card policy. According to OCCC, Polk's declaration, which is vague, speculative, and not supported by the evidence, also did not provide any evidence of pretext.

The trial court granted OCCC's Plea, and this appeal followed. On appeal, Polk argues the trial court erred by (1) granting OCCC's Plea to the Jurisdiction on Polk's wrongful termination claims based on race discrimination and retaliation, (2) granting OCCC's Plea on Polk's failure-to-promote claim based on racial discrimination, (3) granting OCCC's Plea on Polk's hostile work environment claim based on racial harassment, and (4) considering Vargas's affidavit and Dow's November 3, 2015 memoranda, which was attached to Vargas's affidavit.

19

**Evidentiary Objections**

In his fourth issue, Polk argues the trial court erred by considering Vargas's affidavit because Vargas has no personal knowledge of the facts set forth in her affidavit, which "is just a conduit for hearsay." Polk further argues that Dow's November 3, 2015 memorandum on which Vargas relied is inadmissible hearsay.

OCCC responds that Polk did not preserve these arguments for our review because he failed to secure rulings from the trial court on his objections to Vargas's affidavit and Dow's memorandum, and even if his objections had been preserved, Polk's objections are without merit because, as a human resources officer, one of Vargas's job functions is to "know what an entity's requirements are and historically have been for promotion from one position to another within the entity." OCCC argues those are standard facts within the knowledge of typical human resources officers.[6]

To preserve a complaint for appellate review, a party must first complain to the trial court by way of a timely request, objection, or motion, and the trial court must rule or refuse to rule on such matters. TEX. R. APP. P. 33.1(a). A party who objects to evidence offered in support of a plea to the jurisdiction must obtain a written ruling on his objection at, before, or very near the time the trial court rules

---

[6] Polk does not include any case law or analysis for this issue, and he does not address OCCC's preservation argument in his reply brief.

on the plea or risk waiver. *See Cnty. of El Paso v. Baker*, 579 S.W.3d 686, 694 (Tex. App.—El Paso 2019, no pet.). Objections to hearsay and lack of personal knowledge are defects in form that must be preserved for appeal. *Id.* (stating objections to hearsay must be preserved for appellate review); *City of Dall. v. Papierski*, No. 05-17-00157-CV, 2017 WL 4349174, at *2–3 (Tex. App.—Dallas Oct. 2, 2017, no pet.) (mem. op.) (stating party must object to defect in form of affidavit attached to plea to jurisdiction and obtain ruling to preserve objection for appeal); *see also UT Health Sci. Ctr.–Hous. v. Carver*, No. 01-16-01010-CV, 2018 WL 1473897, at *5 (Tex. App.—Houston [1st Dist.] Mar. 27, 2018, no pet.) (mem. op.) (stating defects in form include objections to hearsay and lack of personal knowledge).

Because Polk did not obtain rulings on his evidentiary objections to Vargas's affidavit or Dow's memorandum, we will consider Vargas's affidavit and its attachments, including Dow's November 3, 2015 memorandum, in our review. *See Cnty. of El Paso*, 579 S.W.3d at 694 ("[U]nless an order sustaining an objection to hearsay or lack of personal knowledge to summary judgment evidence is reduced to writing, signed, and entered of record, the evidence remains part of the summary judgment proof even if a party has objected to an opponent's summary judgment evidence."); TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay."); *see also Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004) (stating

21

standard applied in reviewing plea to jurisdiction "mirrors that of a summary judgment").[7]

We overrule Polk's fourth issue.

## Plea to the Jurisdiction

In his first, second, and third issues, Polk argues the trial court erred by granting OCCC's Plea to the Jurisdiction because based on the evidence before the trial court, a reasonable jury could conclude that "OCCC's failure to promote [him] on schedule was the result of race discrimination" and "the real reason for [his] termination was his race and his protected activity." Polk further argues that the trial court erred in dismissing his claim for racial harassment because OCCC failed to address that claim in its Plea and to the extent it properly addressed the claim, contrary to OCCC's arguments, Polk did "exhaust the claim before the EEOC."

---

[7] We note that even if Polk had preserved his evidentiary objection to Vargas's affidavit based on lack of personal knowledge, he still would not prevail. An affiant's position or job responsibilities can establish personal knowledge of facts and establish how the affiant learned of the facts. *Valenzuela v. State & Cnty. Mut. Fire Ins. Co.*, 317 S.W.3d 550, 553 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see Wright v. Hernandez*, 469 S.W.3d 744, 752 (Tex. App.—El Paso 2015, no pet.) (holding affiant's position as human resources manager sufficient to demonstrate personal knowledge); *see generally DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (stating personal knowledge of investigation into "pirate access devices" can be "reasonably inferred" from affiant's position as Senior Director of Signal Integrity).

22

## A.    Standard of Review

"[S]ubject-matter jurisdiction is essential to a court's power to decide a case." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000).  The trial court's subject matter jurisdiction may be challenged through a plea to the jurisdiction. *See Miranda*, 133 S.W.3d at 225–26; *Blue*, 34 S.W.3d at 554 ("A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat a cause of action without regard to whether the claims asserted have merit.").  Whether a court has subject matter jurisdiction is a question of law, and we thus review a ruling on a plea to the jurisdiction *de novo*.  *Miranda*, 133 S.W.3d at 226, 228.

A plea to the jurisdiction may be advanced to challenge whether a plaintiff has satisfied its burden to allege jurisdictional facts or to challenge the existence of jurisdictional facts. *See Miranda*, 133 S.W.3d at 226–27.  If the plea challenges the existence of jurisdictional facts, we apply the procedure and standard of review applicable to summary judgments.  *See id.* at 228.  We consider the relevant jurisdictional evidence submitted by the parties, taking as true all evidence favorable to the plaintiff, indulging all reasonable inferences and resolving all doubts in the plaintiff's favor.  *Id.*  If the defendant asserts, and supports with evidence, that the trial court lacks subject matter jurisdiction, the burden shifts to the plaintiff to show there is a disputed material fact concerning jurisdiction.  *Id.*  If the jurisdictional evidence, considered in the light most favorable to the plaintiff, raises at least a

23

question of fact as to the jurisdictional issue, the plea must be denied, leaving the matter to be resolved by the factfinder. *Id.* at 227–28.

A plaintiff raises a genuine issue of material fact by producing more than a scintilla of evidence regarding a jurisdictional issue. *See Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013). More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). There is less than a scintilla of evidence when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a material fact. *Id.*; *see also Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (stating evidence offered to prove vital fact that does nothing more than "create a mere surmise or suspicion of its existence" does not meet scintilla standard and is no evidence at all). When the circumstantial evidence is so slight that "any plausible inference is purely a guess, it is in legal effect no evidence." *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001).

## B.    Sovereign Immunity

Sovereign immunity "deprives a trial court of subject matter jurisdiction for lawsuits in which the state or certain governmental units have been sued unless the state consents to suit." *Miranda*, 133 S.W.3d at 224; *see also Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008) ("Sovereign immunity and its counterpart, governmental immunity, exist to protect the State and its political

subdivisions from lawsuits and liability for money damages."). The legislature has provided a limited waiver of immunity from suit for employment discrimination and retaliation claims falling within the scope of the Texas Commission on Human Rights Act ("TCHRA"). *See* TEX. LAB. CODE §§ 21.051, 21.055; *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 513 (Tex. 2012); *Garcia*, 253 S.W.3d at 660. "[A] claimant can bring suit under the TCHRA against a governmental entity only after [the] claimant strictly satisfies the procedural requirements outlined in the TCHRA." *Chatha*, 381 S.W.3d at 513–14.

## C. Discrimination and Retaliation Claims under the TCHRA

The TCHRA states that an employer commits an "unlawful employment practice" if, because of race, color, disability, religion, sex, national origin, or age, the employer:

> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
>
> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

TEX. LAB. CODE § 21.051. Further, an employer commits an unlawful employment practice if it retaliates or discriminates against a person who:

> (1) opposes a discriminatory practice;

25

(2)  makes or files a charge;

(3)  files a complaint; or

(4)  testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

TEX. LABOR CODE § 21.055.

To establish a prima facie case of race discrimination, a plaintiff must establish that he (1) is a member of a protected class, (2) was qualified for his position, (3) suffered an adverse employment action, and (4) was replaced by someone outside of his protected class or others similarly situated to him were treated more favorably. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008); *see also Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 434 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). To establish a prima facie case of retaliation, an employee must show that (1) he engaged in an activity protected by the TCHRA, (2) he experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 782 (Tex. 2018).

There are two methods by which a plaintiff can establish discrimination and retaliation under the TCHRA. *See id.* at 781–82; *Donaldson*, 495 S.W.3d at 433. An employee can offer direct evidence of the employer's discriminatory or retaliatory actions or words. *See Clark*, 544 S.W.3d at 782. Because direct evidence

26

of discrimination is rarely available in employment cases, courts also allow claims to proceed based on indirect or circumstantial evidence of discrimination or retaliation. *See id.* (stating employees can establish prima facie case of discrimination with circumstantial evidence because "smoking guns are hard to come by"); *see also Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994) (stating "direct evidence of employment discrimination is rare"). Under this second method, Texas courts follow the burden-shifting mechanism set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–05 (1973). *See Clark*, 544 S.W.3d at 782.

Under the *McDonnell Douglas* framework, an employee must first establish a prima face case for his claims. If the employee establishes a prima facie case of discrimination or retaliation, a rebuttable presumption of discrimination or retaliation arises. *Id.* The employer can defeat this presumption by producing evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.*; *see also Tex. Dep't of Aging and Disability Servs. v. Lagunas*, 618 S.W.3d 845, 853 (Tex. App.—El Paso 2020, no pet.) (stating employer must "articulate some legitimate, nondiscriminatory reason" for its failure to promote employee); *Tex. Dep't of State Health Servs. v. Resendiz*, 642 S.W.3d 163, 175 (Tex. App.—El Paso 2021, no pet.) ("[A]n employer's articulated reasons for the adverse

termination decision must be sufficiently specific to give the employee the opportunity to present evidence establishing that the reasons were pretextual.").

If the employer meets its burden to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the employee to come forward with sufficient evidence to raise a genuine issue of material fact on the question of whether the employer's stated reason is a pretext for discrimination or retaliation. *Clark*, 544 S.W.3d at 782. To raise a fact issue regarding pretext, the employee must present evidence indicating that "the non-discriminatory reason given by the employer is false or not credible, and that the real reason for the employment action was unlawful discrimination." *See Donaldson*, 495 S.W.3d at 438; *see also Datar v. Nat'l Oilwell Varco, L.P.*, 518 S.W.3d 467, 478 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (stating plaintiff can avoid summary judgment if evidence creates fact issue as to whether each of employer's stated reasons was not what actually motivated employer and creates reasonable inference that employer acted with intent to discriminate or retaliate)).

Although intermediate evidentiary burdens shift back and forth under the *McDonnell Douglas* framework, the ultimate burden of persuading the trier-of-fact that the employer intentionally discriminated against the employee always remains with the employee. *Clark*, 544 S.W.3d at 782; *Donaldson*, 495 S.W.3d at 435.

**D. Exhaustion of Administrative Remedies**

A person claiming a violation of the TCHRA must first exhaust his administrative remedies prior to filing suit. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010); *Lopez v. Tex. State Univ.*, 368 S.W.3d 695, 701 (Tex. App.—Austin 2012, pet. denied) ("The exhaustion of administrative remedies is a jurisdictional prerequisite to filing suit for unlawful employment practices." (citing *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996))); *Santi v. Univ. of Tex. Health Sci. Ctr. at Hous.*, 312 S.W.3d 800, 804 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("Failure to timely file an administrative complaint deprives Texas trial courts of subject-matter jurisdiction.").

To exhaust administrative remedies under the TCHRA, a plaintiff must (1) file a charge of discrimination with the TWC within 180 days of the alleged discriminatory act, (2) allow the TWC 180 days to dismiss or resolve the charge, and (3) file suit in district court within 60 days of receiving a right-to-sue letter from the TWC and no later than two years after filing the charge. *See* TEX. LABOR CODE §§ 21.202, .208, .254, .256.

A lawsuit under the TCHRA is limited to the claims asserted in the charge filed with TWC and factually related claims that reasonably can be expected to grow out of the TWC's investigation. *Santi*, 312 S.W.3d at 805. In reviewing a claimant's discrimination charge, courts should construe it with "utmost liberality," although

the charge must contain an adequate factual basis so that it puts the employer on notice of the existence and nature of the charges. *City of Sugar Land v. Kaplan*, 449 S.W.3d 577, 582 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Santi*, 312 S.W.3d at 805. "The crucial element of a charge of discrimination is the factual statement contained" in the administrative complaint. *Santi*, 312 S.W.3d at 805 (quoting *Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 321 (Tex. App.— Texarkana 2008, pet. denied)); *see also Preston v. Tex. Dep't of Family & Prot. Servs.*, 222 Fed. App'x. 353, 356 (5th Cir. 2007) ("[A] charge is sufficient when . . . sufficiently precise to identify the parties, and to describe generally the action or practices complained of.").

### Wrongful Termination

In its Plea, OCCC moved to dismiss Polk's wrongful termination claim arguing Polk had no evidence to support his "subjective belief" that he was terminated in retaliation for filing a discriminatory complaint. OCCC argued that it was objectively "unreasonable to believe" that OCCC had terminated Polk in December 2017 "because of the discrimination complaint" Polk had filed two years earlier in February 2016, and thus such a gap could not "support an inference of causation." In his response, Polk asserted that his retaliation claim was viable because the summary judgment evidence "raise[d] an inference of causation", and he further claimed he had met his prima facie case of wrongful termination based on

race.  Arguing Polk had not raised a claim of termination based on race, OCCC responded that the claim was subject to dismissal.  And as to his wrongful termination claim based on retaliation, OCCC argued that the evidence was insufficient to establish causation or pretext.

In his first issue, Polk argues the trial court erred in granting OCCC's Plea to the Jurisdiction with respect to his wrongful termination claim based on retaliation because he established a prima facie case for retaliation and further produced evidence of pretext.  He claims that OCCC's decision to terminate his employment based on credit card misuse is false and pretextual and further that OCCC failed to produce admissible evidence supporting OCCC's claim that it also terminated Polk because of his conduct during the December 2017 meeting.

Polk also argues that the trial court erred in granting OCCC's Plea with respect to his wrongful termination claim based on race discrimination because he established a prima facie case for his claim and OCCC neither addressed nor explicitly moved for dismissal of the claim in its Plea.

## A.     Retaliation

To establish a prima facie case of retaliation, an employee must show (1) he engaged in an activity protected by the TCHRA, (2) he experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action.  *Clark*, 544 S.W.3d at 782.  "The causation standard

for the *McDonnell Douglas* prima-facie-case element is not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action." *Id.* Evidence sufficient to establish a causal link between an adverse employment decision and a protected activity may include:

> (1) the employer's failure to follow its usual policy and procedures in carrying out the challenged employment actions; (2) discriminatory treatment in comparison to similarly situated employees; (3) knowledge of the discrimination charge or suit by those making the adverse employment decision; (4) evidence that the stated reason for the adverse employment decision was false; and (5) the temporal proximity between the employee's conduct and discharge.

*Crutcher v. Dall. Indep. Sch. Dist.,* 410 S.W.3d 487, 494 (Tex. App.—Dallas 2013, no pet.) (citing *Green v. Lowe's Home Ctrs., Inc.*, 199 S.W.3d 514, 519 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (discussing factors in context of termination of employment)); *see also Donaldson*, 495 S.W.3d at 444 (quoting *Crutcher*, 410 S.W.3d at 494).

If, after the employee establishes its prima facie case, the employer provides evidence of a legitimate reason for the adverse action, the employee must prove the employer's proffered reason is a pretext for retaliation and the adverse action would not have occurred "but for" the protected activity. *Clark*, 544 S.W.3d at 782. "The but-for causation standard is significantly more difficult to prove than prima facie causation." *Id.* When evaluating but-for causation, we examine all of the circumstances, including "temporal proximity between the protected activity and the

32

adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false." *See id.* at 790. Although useful, these factors ultimately do not supplant the core standard, which requires the plaintiff to show that the unlawful employment action "would not have occurred when it did" but for the unlawful retaliation. *See Apache Corp. v. Davis*, 627 S.W.3d 324, 335 & n.28 (Tex. 2021) (emphasis removed) (citing *Clark*, 544 S.W.3d at 782–83, 790); *see also id.* at 337 ("More importantly, determining but-for causation cannot be a matter of weighing—or worse, counting—factors that may be helpful in analyzing circumstantial evidence in some situations.").

OCCC argues that dismissal of Polk's wrongful termination claim based on retaliation was proper because Polk failed to establish a causal link between the filing of his February 2016 charge of discrimination and OCCC's termination of his employment in December 2017, and Polk failed to show that OCCC's decision to terminate his employment based on his credit card misuse was false and a pretext for discrimination.

### 1.    Temporal Proximity

Polk argues that he satisfied the element of causation in his prima face case because he engaged in protected activities, repeatedly voiced his opposition to racial

discrimination, and participated in the "EEOC/TWC process." *See Clark*, 544 S.W.3d at 786 ("An employee engages in a protected activity by, among other things, filing an internal complaint, opposing a discriminatory practice, or making a charge of discrimination with the EEOC."). OCCC responds that Polk failed to show a causal connection between the filing of his charge of discrimination in February 2016 and OCCC's termination of Polk's employment in December 2017. It argues that twenty-two months transpired between these two events and thus temporal proximity does not support any inference of causation in this case and Polk cannot rely on subsequent events to "re-start the temporal-proximity clock."

### (a) Participation in Charge Investigation

Polk filed his first charge of discrimination in February 2016, alleging OCCC had delayed his promotion to Financial Examiner II by six months based on his race. In June 2017, the parties participated in mediation but they failed to reach settlement. Ultimately, the TWC issued Polk a right to sue letter in October 2017. The filing of Polk's charge of discrimination in February 2016 is too far removed in time from the termination of his employment in December 2017 to demonstrate a causal link between the events based on temporal proximity. *See Clark*, 544 S.W.3d at 790 (stating temporal proximity is relevant to causation when it is "very close" and that eight-month gap between EEOC charge and termination recommendation was "so long as to be of little, if any, probative value"); *Clark Cnty. Sch. Dist. v. Breeden*,

34

532 U.S. 268, 273 (2001) (holding, in context of Title VII retaliation claim, that "[a]ction taken (as here) 20 months later suggests, by itself, no causality at all").

The same is true even if we consider the parties June 2017 mediation. Assuming that Polk's attendance at the mediation constitutes protected activity separate from the filing of his charge, the mediation took place six months before Polk's employment was terminated in December 2017, and thus Polk's participation in mediation does not establish a causal link based on temporal proximity between his protected activity and his termination. *See Clark*, 544 S.W.3d at 790; *Breeden*, 532 U.S. at 273; *see also Democratic Schs. Research, Inc. v. Rock*, 608 S.W.3d at 290, 314 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (holding four-month period between protected activity and termination was insufficient to "raise a fact issue on causation"); *Fields v Teamsters Loc. Union No. 988*, 23 S.W.3d 517, 529 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (stating temporal proximity may establish causation where complaint and adverse action "are separated by weeks, as opposed to months and years").

Polk also points to the right to sue letter, which the TWC issued in October 2017. But what matters for purposes of our analysis is Polk's protected activity, not the activity of a third party. *See Clark*, 544 S.W.3d at 790 (stating temporal proximity measured between time of employee's protected activity and adverse employment action); *see also Ferguson v. Sec'y of Veterans Affairs*, No. 3:20-CV-

35

00212-YY, 2022 WL 2135380, at *4 (D. Or. May 25, 2022), report and recommendation adopted, No. 3:20-CV-00212-YY, 2022 WL 2135785 (D. Or. June 14, 2022) ("[T]here is no basis for finding that the final adjudication of a pending appeal by a neutral third party could stand in as an *employee's* protected activity upon which the temporal proximity analysis could rely.") (emphasis in original). Polk of course did not issue the right to sue letter in October 2017, and thus the issuance of the letter does not establish a causal link between Polk's protected activity and the termination of his employment.[8]  *See Breeden*, 532 U.S. at 273 (recognizing as "utterly implausible" employee's suggestion "that the EEOC's issuance of a right-to-sue letter—an action in which the employee takes no part—is a protected activity of the employee").

### (b) Opposition to Racial Discrimination

Polk also argues that he engaged in protected activity by voicing his opposition to racial discrimination at OCCC.  In his declaration, Polk states that in the "summer or fall of 2015," he "complained about the promotion issues," and "told OCCC that there appeared to be a racial difference."  Polk filed a charge of discrimination with the TWC in February 2016.  After he filed his charge of discrimination, Polk stated that he experienced "petty harassment on a regular basis"

---

[8]     Polk acknowledged that the EEOC's issuance of the right-to-sue letter in October 2017 is "not protected activity by itself."

36

and when his choice of hotels was challenged, Polk "explained that his original hotel was in an area known for racial discrimination and that I had witnessed racial slurs at that hotel," and he protested the discussion of "Texas Heroes" during the Civil War in the OCCC newsletter because its insensitive to racial discrimination and slavery. Polk also stated that in September 2017, he spoke to Commissioner Pettijohn and Director Aguilar about "the racism, the high turnover that the racism caused with black OCCC examiners, and the denial of promotions of black examiners by the OCCC." And he stated that during a November 29, 2017 meeting, he raised concerns about racial issues.

Temporal proximity is calculated from the first instance of protected activity until the adverse employment action. *See Hanks v. Shinseki*, No. 3:08-1594-G, 2010 WL 3000835, at *7 (N.D. Tex. July 28, 2010) ("[T]he date to which the adverse employment decision must be temporally proximate is the date on which the defendants *first* gained knowledge of [the plaintiff's] protected activity") (emphasis in original). Even when a plaintiff alleges that he engaged in a series of protected activities constituting ongoing opposition to alleged discrimination, courts must look to the first instance of opposition activity, not the most recent instance, when analyzing temporal proximity. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 428 n.23 (5th Cir. 2017) (holding temporal proximity between plaintiff's opposition activity and adverse employment action measured from first instance of protected

activity and plaintiff who alleged she repeatedly engaged in protected activity for seven months afterward, could not rely on later instances of opposition activity to "re-start the temporal-proximity clock") (internal quotation omitted); *see also Perkins v. Child Care Assocs.*, 751 F. App'x 469, 474 (5th Cir. 2018) ("Moreover, plaintiffs 'cannot, with each protected activity, re-start the temporal-proximity clock' by alleging that an employer 'repeatedly engaged in protected activity' over a period of time." (quoting *Alkhawaldeh*, 851 F.3d at 428 n.23)).

To the extent Polk argues that OCCC retaliated against him because he voiced his opposition to racial discrimination at OCCC, the record reflects that Polk's opposition began in the "summer or fall of 2015," and thus such complaints of discrimination are further removed in time from his termination in December 2017. *See Alkhawaldeh*, 851 F.3d at 428 n.23; *see also Hanks*, 2010 WL 3000835, at *7. Although Polk argues that he continued to voice his opposition to the alleged ongoing racial discrimination until mere weeks before he was fired in December 2017, Polk cannot rely on these more recent events to establish causation based on temporal proximity. *See Perkins*, 751 F. App'x at 474; *Alkhawaldeh*, 851 F.3d at 428 n.23.

Citing to *Starnes v. Wallace*, 849 F.3d 627 (5th Cir. 2017), Polk argues that courts have "regularly found temporal proximity based on actions that took place long after the original complaint of discrimination." But the facts of *Starnes* are

distinguishable and do not support Polk's arguments. In October or early November 2010, Ludy Estrada, one of LeAnn Starnes's coworkers, complained to Starnes that their employer was not paying her husband Vincent for his travel time or overtime. Starnes recommended that Ludy report the violation to human resources, but Ludy refused for fear of being fired for reporting the violation. A few days later, Starnes met with human resources on Ludy's behalf and told the human resources officer that the company was "violating the law by the way [it was] paying Vincent." Starnes later repeated her concerns to the company president. *Id.* at 630.

In November 2011, Ludy complained to human resources that Vincent's pay dispute had not been resolved and Ludy and Vincent requested $68,713.38 in owed wages. The company president met with Ludy in December 2011 to negotiate the wage dispute, during which time the president indicated that he believed that Starnes "was to blame" for the problems with Vincent's wage claim, even though Starnes had not been involved in the dispute since she first spoke to the human resources president. During the last week of December 2011, the company settled the wage dispute with Ludy and Vincent for $40,000. Ten days later, on January 6, 2012, the company laid off five employees, including Starnes and Ludy. Starnes eventually filed suit. *Id.* at 631.

The district court held that Starnes could not establish a prima facie case for her claim of wrongful termination based on retaliation because Starnes "could not

establish a causal link because of significant passage of time—more than a year—between her protected activity and termination." *Id.* at 634. The Fifth Circuit Court of Appeals disagreed, stating:

> Although Starnes was terminated more than a year after she engaged in protected activity, the termination occurred just ten days after [the company] paid $40,000 to resolve the problem Starnes raised. The time when funds have gone out the door may be when the retaliatory impulse is strongest. The termination also came within a month of the meeting between [the company president] and Ludy, in which [the company president] heatedly blamed Starnes for the dispute over Vincent's pay.

*Id.* at 635.

Relying on *Starnes*, Polk claims the evidence is sufficient to establish the requisite causal link for his retaliation claim. He argues that shortly after the EEOC issued its right to sue letter in October 2017, OCCC began its "investigation" of Polk in November 2017, and ultimately fired him in December 2017. He argues that a reasonable jury could conclude that OCCC terminated his employment because it knew Polk was about to file a lawsuit and this may be "when the retaliatory impulse is strongest." *See id.* But in *Starnes*, the company had paid $40,000 to resolve a dispute the company's president expressly blamed on Starnes and Starnes was laid off ten days later. There is no such evidence here. At most, the timing of the EEOC's right to sue letter supports an inference that OCCC was aware that Polk might sue OCCC in the future. But Polk did not file suit until after his termination, and unlike

40

the employer in *Starnes*, OCCC did not experience an immediate, negative consequence stemming from Polk's protected activity. *Starnes* is thus inapposite.

We conclude that Polk did not establish a prima face case of retaliation because he did not establish a causal link between his protected activity and his termination.

### 2.    Pretext for Retaliation[9]

Polk also failed to establish pretext. Polk argues the trial court erred in dismissing his retaliation claim because he offered evidence that OCCC's decision to terminate his employment for credit card misuse is false and pretextual, and OCCC failed to produce admissible evidence supporting OCCC's claim that it also terminated Polk due his conduct during the December 2017 meeting leading to his termination.

Pretext can be shown by "revealing weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's stated reasons which a "fact finder could find unworthy of credence." *Tex. Dep't of Transp. v. Flores*, 576 S.W.3d 782, 794 (Tex. App.—El Paso 2019, pet. denied) (citing *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1198 (10th Cir. 2000)). OCCC's Travel Guidelines and Regulations state that an employee's travel credit card "**is to**

---

[9]    Polk's pretext argument does not differentiate between his claims for wrongful termination based on retaliation and for wrongful termination based on race discrimination.

**be used only for official state business"** and "a credit card issued to a state employee for state purposes may not be used for personal expenditures or any other type of expenditure not reimbursable as a state business expense under state law." (Emphasis in original). As relevant here, OCCC's Standards of Conduct Policy states that certain violations are "subject to disciplinary action up to and including termination, as deemed appropriate and necessary," including "violating any agency rule or any action that is detrimental to the OCCC's efforts to operate effectively and efficiently" and "unauthorized use of OCCC equipment or property for personal reasons."

Polk does not dispute that his use of his travel credit card violated OCCC's written policy prohibiting employees from using their credit card for personal expenses. Rather, Polk argues that his conduct complied with the policy as practiced at OCCC because he was instructed during training that he could use his travel credit card to purchase gasoline, other financial examiners used their cards the same way Polk used his, and, although his monthly travel vouchers were routinely reviewed and audited, no one at OCCC notified him that he was violating OCCC's credit card policy. He further argues that OCCC's proffered reason for his termination is unworthy of credence because his credit card use did not violate the credit card policy as practiced at OCCC, other examiners used their cards as Polk did, no one at OCCC notified him that he was using his credit card incorrectly, the timing of

42

OCCC's investigation into his travel vouchers and credit card use is suspicious, the alleged violations were minor and had no financial impact on OCCC, and OCCC concocted a second reason during the course of the litigation to justify Polk's termination.

Although Polk argues that he was instructed during training that he could use his travel credit card to purchase gasoline,[10] there is no evidence Polk was instructed he could use his travel credit card to purchase gasoline regardless of whether the gasoline was for official state business. Polk also argues that other, unidentified financial examiners used their travel credit cards in the same way he did. Aside from Polk's self-serving and conclusory statement to this effect, however, the only evidence Polk relies upon is Thompson-Hill's declaration where she stated that she "observed that most if not all examiners used their credit cards the same way as Ernest Polk." But during her deposition, Thompson-Hill clarified this general statement of conformity, and she testified that she knew of no financial examiners who used their cards to purchase gas while on vacation for personal travel. Furthermore, even if Polk were correct that other financial examiners used their travel credit cards in the same way he did, there is no evidence that OCCC management knew of such use when they terminated Polk's employment or that

---

[10]     Polk's affidavit does not identify who instructed him in this regard.

43

OCCC knew that other financial examiners were using their cards the same way as Polk and did not terminate their employment.

Similarly, Polk's assertion that he used his credit card in the same way for over two years, that the accounting department reviewed and audited his expenditures monthly, and that no one told him he was misusing the card or violating OCCC's travel policy is not evidence of pretext. At most, this evidence reflects a lack of meaningful oversight at OCCC. It does not indicate that Polk's use of his credit card complied with OCCC's policy and, without more, it merely creates a mere surmise or suspicion that termination of his employment for credit card misuse was a pretext for discrimination or retaliation. *See Neely*, 418 S.W.3d at 59 (stating plaintiff must produce more than scintilla of evidence to raise genuine issue of material fact). Polk claims that it is impossible to separate gasoline used for state business from gasoline used for personal reasons, but, as OCCC points out, it produced evidence that Polk used his credit card to purchase gasoline hundreds of miles away in Louisiana on a Friday when he was not working or otherwise traveling for state business, or when he was not working the entire week of Thanksgiving.

Moreover, whether OCCC was correct in concluding that Polk violated OCCC's credit card policy is irrelevant. *See Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (stating for purposes of determining falsity in summary judgment/pretext context, "[a]n explanation is false or unworthy of credence if it is

not the real reason for the adverse employment action"). The issue presented is not whether OCCC made the correct decision, but rather whether OCCC's decision to terminate Polk's employment was driven by a discriminatory or retaliatory motive. *See Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir. 1993) ("To the extent that [plaintiff's] summary judgment evidence relates to his innocence of the sexual harassment charge, it is irrelevant. He must, instead, produce evidence demonstrating that [defendant] did not in good faith believe the allegations, but relied on them in a bad faith pretext to discriminate against him *on the basis of his age.*" (emphasis in original)); *see also Swenson v. Schwan's Consumer Brands N. Am., Inc.*, No. SA-10-CA-00602-OLG, 2012 WL 12964644, at *3 (W.D. Tex. Apr. 24, 2012), *aff'd*, 500 Fed. App'x. 343 (5th Cir. 2012) ("For example, an employer could believe that an employee was stealing from the company, and even if this was completely false, it would not make the employer's justification for terminating that employee worth any less credence."); *see Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) ("An employer's explanation can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action."); *Beebe v. City of San Antonio ex rel. City Pub. Serv. Bd. of San Antonio*, No. 04-13-00134-CV, 2014 WL 4437648, at *5 (Tex. App.—San Antonio Sept. 10, 2014, no pet.) (mem. op.) ("At the pretext stage in the analysis, the issue is whether the employer's reason, even if incorrect, was the real reason for

45

the employment action. . . . The employer is entitled to be unreasonable so long as it does not act with discriminatory animus.") (internal citations omitted). Polk has not presented any evidence that OCCC lacked a good faith belief that he violated the travel policy or relied on this basis in bad faith to mask its discriminatory or retaliatory motive for terminating Polk's employment.

Polk also argues that the severity of his alleged violations of OCCC's credit card policy indicates that his alleged credit card misuse was not the real reason for his termination but rather a pretext for discrimination or retaliation. According to Polk, a factfinder could reasonably conclude that OCCC's decision to fire him because he violated OCCC's credit card policy is a pretext for discrimination or retaliation because the total amount of the gasoline he allegedly purchased for personal use was less than $100, he paid the credit card bills himself, he did not request or receive reimbursement for any of the gasoline purchases, and he was never told he was using his card incorrectly.

Vargas stated in her declaration that, in November 2017, OCCC discovered Polk had used "his official credit card for personal use and that he had submitted reimbursement requests for dozens of expenditures that were not lawfully reimbursable," and she attached a list of over 60 instances between March 2017 and October 2017, including over 20 instances when Polk used his credit card for personal use. In her declaration, Graham, OCCC's Supervising Financial Examiner,

46

stated that Polk had used his state travel credit card for personal use, and she identified three of the purchases, two of which were included in the list attached to Vargas's declaration, including Polk's use of his travel credit card during the week of Thanksgiving when he was on vacation or Thanksgiving leave, which was not included on the list. Even assuming that the severity of an employee's violation is some evidence of pretext, Polk's evidence, at most, creates "mere surmise or suspicion" that OCCC's claim that it terminated Polk's employment was a pretext for retaliation or discrimination, and is thus insufficient to raise a genuine issue of fact. *See King Ranch, Inc.*, 118 S.W.3d at 751; *see generally Thompson v. Veterans Canteen Serv.*, 156 F. Supp. 3d 22, 27 (D.D.C. 2016) ("While [employee's] actions hardly seem to amount to a firing offense, that is not the question here. . . . The only issue is whether [her employer] acted <u>because of</u> Plaintiff's age or sex." (Emphasis in original)).

Polk further argues that "OCCC apparently figured out that its justification for firing [him for misusing his travel credit card] was transparently pretextual, because OCCC soon pivoted to a different story." Based on Vargas's affidavit, Polk argues that OCCC offered after a second reason for terminating his employment during the litigation—Polk's conduct during the December 2017 meeting. *See Univ. of Tex. Sw. Med. Ctr. v. Vitetta*, No. 05-19-00105-CV, 2020 WL 5757393, at *21 (Tex. App.—Dallas Sept. 28, 2020, no pet.) (mem. op.) ("Doubt in the employer's asserted

reason can be established in a number of ways, including by proof that the employer provided shifting or different reasons for its action at different times."). But OCCC responds that that the only reason it terminated Polk was because he misused his travel credit card, and any evidence reflecting Polk's behavior during the termination meeting was offered for context. A review of Vargas's affidavit makes this clear. Vargas does not state that Polk's employment was terminated based on his behavior at the December 2017 meeting. Rather, Vargas describes Polk's reaction and response during the meeting to OCCC's claims that Polk had misused his card by purchasing gasoline for his personal use. She does not state Polk was terminated due to his behavior. There is thus no evidence that OCCC offered a second reason for Polk's termination.

Polk also points to evidence that OCCC did not "begin investigating Mr. Polk until shortly after he had spoken to the Commissioner and Director in person at the annual conference [about the racial discrimination he believed was occurring at OCCC], and shortly after the EEOC issued a right-to-sue letter" in October 2017. According to Polk, "[t]hese suspicious circumstances are indicative of pretext – that OCCC's story is unworthy of credence." Because OCCC did not identify the event that led to its investigation of Polk in November 2017 concerning his credit card use and travel vouchers, Polk argues, without pointing to any evidence, that OCCC's investigation was triggered by his discussions with Commissioner Pettijohn and

Director Aguilar during the September 2017 conference, or the issuance of the right-to-sue letter in October 2017. Polk's speculation of wrongdoing cannot support a finding of pretext. *See Greathouse v. Alvin Indep. Sch. Dist.*, 17 S.W.3d 419, 425 (Tex. App.—Houston [1st Dist.] 2000, no pet.) ("Summary judgment for the defendant is proper when a plaintiff claiming race discrimination presents only conclusory allegations, improbable inferences, unsupportable speculation, or subjective beliefs and feelings.").

Although Polk's evidence may reveal some possible weaknesses in OCCC's explanation that it terminated him for credit card misuse, such evidence, even when considered as a whole, does no more than create "mere surmise or suspicion" that OCCC's proffered reason was a pretext for retaliation or discrimination, and is thus insufficient to raise a genuine issue of fact. *See King Ranch, Inc.*, 118 S.W.3d at 751; *see generally Flores*, 576 S.W.3d at 794 (stating employee may show that employer's proffered reason is false by "revealing weaknesses, implausibilities, inconsistencies, or contradictions that a fact finder could find unworthy of credence").

We hold the trial court did not err in granting OCCC's Plea to the Jurisdiction on Polk's wrongful termination claim based on retaliation because Polk failed to establish his prima facie case of retaliation, and he also failed to establish that OCCC's explanation for his termination was false and a pretext for retaliation.

**B. Race Discrimination**

OCCC argues that Polk's claim for wrongful termination based on race discrimination is barred because Polk did not raise this claim in his charge of discrimination and thus Polk failed to exhaust his administrative remedies. *See* TEX. LAB. CODE §§ 21.201, 21.252–.254 (stating filing charge of race discrimination is prerequisite to suing employer for claim); *Chatha*, 381 S.W.3d at 512 ("In a statutory cause of action against a governmental entity, the failure to adhere to the statute's mandatory provisions that must be accomplished before filing suit is a jurisdictional bar to suit."). Polk argues that OCCC neither addressed nor moved to dismiss Polk's claim for wrongful termination based on race discrimination in its Plea to the Jurisdiction.

Contrary to Polk's argument, OCCC did address Polk's wrongful termination claim based on race discrimination in is Plea. It argued that to the extent Polk was attempting "to litigate other claims, such as a separate claim for racial discrimination or a racial harassment claim, such claims [were] barred" because Polk's charges did "not preserve those distinct claims."[11] We further note that even if OCCC had not raised the issue, an employee's failure to exhaust his administrative remedies with respect to his claims under the TCHRA deprives a trial court of subject matter

---

[11] OCCC further argued that even if Polk had "raised a racial discrimination claim based on his termination, such a claim would fail for substantially the same reasons his retaliation claim fails."

50

jurisdiction over those claims. *See Lopez*, 368 S.W.3d at 701 ("The exhaustion of administrative remedies is a jurisdictional prerequisite to filing suit for unlawful employment practices."); *see also M.D. Anderson Cancer Ctr. v. Wang*, No. 01-23-00911-CV, 2024 WL 2853698, at *6 (Tex. App.—Houston [1st Dist.] June 6, 2024, no pet. h.) (mem. op.) (holding trial court lacked subject matter jurisdiction to hear lawsuit for disability discrimination and retaliation because employee failed to exhaust his administrative remedies). An employer may thus raise this issue for the first time on appeal. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993) ("Subject matter jurisdiction is an issue that may be raised for the first time on appeal[.]"); *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004) ("[W]e are obligated to review *sua sponte* issues affecting jurisdiction."); *see also San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 136 (Tex. 2015) (explaining appellate court was obligated to consider new jurisdictional arguments on appeal when governmental entity challenged plaintiff's prima facie case under TCHRA). We thus consider OCCC's argument that Polk failed to exhaust his administrative remedies for his wrongful termination claim based on race. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 445–46.

Polk argues that although he did not check the box marked "Race" on his May 2018 charge of discrimination involving his termination, or repeat the allegations of race discrimination raised in his February 2016 charge of discrimination involving

51

OCCC's alleged failure to promote him, he nevertheless exhausted his administrative remedies for his claim of wrongful termination based on race discrimination. He argues this is so because "[g]iven the extensive claims of race discrimination in the EEOC proceedings" arising from his February 2016 charge of discrimination, "a claim of race discrimination would be reasonably expected to grow out of the investigation" into Polk's May 2018 charge of discrimination relating to the termination of his employment. We disagree.

A lawsuit under the TCHRA is limited to claims made in the charge or complaint filed with TWC, and factually related claims that reasonably can be expected to grow out of the TWC's investigation. *Santi*, 312 S.W.3d at 805. Courts construe charges of discrimination liberally and "look slightly beyond its four corners, to its substance rather than its label" to determine the scope of the administrative investigation "which can reasonably be expected to grow out of the charge of discrimination." *Pacheco v. Mineta*, 448 F.3d 783, 788–89 & n.9 (5th Cir. 2006); *City of Sugar Land v. Kaplan*, 449 S.W.3d 577, 581–82 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Although we construe charges of discrimination with "utmost liberality," the charge must nevertheless contain an adequate factual basis to put the employer on notice of the existence and nature of the charges. *Kaplan*, 449 S.W.3d at 582; *Santi*, 312 S.W.3d at 805. "The crucial element of a charge of

discrimination is the factual statement contained" in the administrative complaint. *Santi*, 312 S.W.3d at 805 (quoting *Bartosh*, 259 S.W.3d at 321).

"[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." *Sw. Convenience Stores, LLC v. Mora*, 560 S.W.3d 392, 401–02 (Tex. App.—El Paso 2018, no pet.) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)). While every detail of the complaint need not be included in the charge, the substance of the claim still must fall "within the scope of 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id.* Courts will not construe the charge to include facts that were initially omitted. *Id.* at 401; *Cnty. of Travis ex rel. Hamilton v. Manion*, No. 03-11-00533-CV, 2012 WL 1839399, at *4 (Tex. App.—Austin May 17, 2012, no pet.) (mem. op.).[12]

Polk filed a charge of discrimination stemming from his termination in May 2018. In it, he marked the box "Retaliation" only, and in describing the particulars of his claim, he did not allege that he was wrongfully terminated based on his race. Polk alleged that "he was discharged by Juan Garcia, Director of Communications

---

[12]     Although Polk's intake questionnaire for his 2016 charge is included in the record, the record does not contain an intake questionnaire for his May 2018 charge.

53

for alleged misuse of the organizations credit card" which allegation was "patently false." He alleged that he was "discharged in retaliation for [his] having raised previous concerns of racial discrimination and because [he] filed a charge of discrimination with the EEOC, in violation of Title VII of the Civil Rights Act of 1964 as amended." Polk repeated this same allegation during this deposition. In describing the meeting leading to his termination, he testified:

> Q. What were the questions about?
>
> A. I don't recall the specifics, but it was travel voucher. Then they left that subject and went to the travel card, and [Juan] Garcia asked me did I use the card for personal use and...
>
> Q. What did you tell him?
>
> A. I stated yes because it's impossible not to use it for personal use when you submit a travel voucher for personal reimbursement, it's called personal mileage reimbursement,
>
> Q. How did he respond to that?
>
> A. He said immediately — once I said yes, he said you're fired. That's what I recall.
>
> Q. How did the meeting end?
>
> A. Oh, when he said that, I said well, any -- well, he said that, and he said turn in this and turn in that, I said none of this information has things that would exonerate me because they were talking about car rentals. Well, I have emails where they gave me the coding and the billing to rent the vehicle. So I'm approved in the accounting department. So I said I don't - I'm not doing that. And I said I will turn it in, I'm leaving, this is wrong. I told them this is retaliatory. I said that's the only reason why you're doing this. I said and -

54

Q.      What did you believe it was retaliatory for?

A.      Oh, for the EEOG charge. I had already sued in late October and here you go mid December coming up with things that are false and then I mention one thing, have no opportunity for explanation and you say you're fired.

There is no allegation in Polk's charge that his race played a role in his termination. Polk thus did not articulate a factual basis supporting a claim that he was terminated based on his race, as opposed to in retaliation for him raising "previous concerns of racial discrimination."

Because Polk's charge does not contain an adequate factual basis to put OCCC on notice of the existence and nature of his claim for wrongful termination based on race discrimination, the trial court did not err in granting OCCC's Plea on that claim. *See Kaplan*, 449 S.W.3d at 582; *Santi*, 312 S.W.3d at 805 (stating charge must contain adequate factual basis so that it puts employer on notice of existence and nature of charges); *cf. Salman v. KIPP, Inc.*, No. 01-19-00886-CV, 2021 WL 2931360, at *6 (Tex. App.—Houston [1st Dist.] July 13, 2021, pet. denied) (mem. op.) (concluding plaintiff provided adequate factual basis to put charter school on notice that she was complaining of discrimination based on retaliation where she alleged details of two occasions when she complained about school's decisions that could have possibly led to her termination); *Alief Indep. Sch. Dist. v. Brantley*, 558 S.W.3d 747, 756–57 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (concluding plaintiff's discrimination charge included adequate factual basis to put

school district on notice that he was complaining of discrimination based on his race and gender resulting in hostile work environment where charge generally described actions or practices about which he complained); *Santi*, 312 S.W.3d at 805–06 (holding plaintiff's EEOC charge included adequate factual basis to put defendant university on notice that plaintiff was complaining of gender discrimination where she alleged instances of being treated differently from male counterparts).

We overrule Polk's first issue.

### Failure to Promote

In his second issue, Polk argues the trial court erred by granting OCCC's Plea to the Jurisdiction for his failure-to-promote claim because a reasonably jury could "conclude that OCCC's failure to promote [Polk] on schedule was the result of race discrimination." He argues that although he was qualified for the position of Financial Examiner II in May 2015, Dow delayed his recommendation for promotion until November 2015 because of Polk's race. According to Polk, Dow's recommendation was the only requirement for the promotion Polk lacked, and Dow withheld the recommendation based on Polk's race. He further argues that OCCC's explanations for not recommending him for promotion in May 2015 are pretextual.

### A.    Applicable Law – Failure to Promote

To establish a prima facie case of discrimination for his failure to promote claim, Polk must establish that (1) he is a member of a protected class, (2) he sought

and was qualified for an available employment position, (3) despite his qualifications, he was not selected for the position, and (4) OCCC selected someone not in Polk's protected class or continued to seek applicants with OCCC's qualifications. *Anderson v. Hous. Cmty. Coll. Sys*., 458 S.W.3d 633, 645 (Tex. App.—Houston [1st Dist.] 2015, no pet.). If Polk meets his burden to establish a prima facie case for discrimination, the burden shifts to OCCC to produce sufficiently specific evidence of a legitimate, nondiscriminatory business reason for its failure to promote Polk to Financial Examiner II in May 2015. *See Lagunas*, 618 S.W.3d at 853 (stating employer must "articulate some legitimate, nondiscriminatory reason" for its failure to promote employee); *Resendiz*, 642 S.W.3d at 175 ("[A]n employer's articulated reasons for the adverse termination decision must be sufficiently specific to give the employee the opportunity to present evidence establishing that the reasons were pretextual."). OCCC's burden to provide a legitimate, nondiscriminatory reason for not promoting Polk in May 2015 is "one of production, not persuasion, and it involves no credibility assessment." *Tex. Health & Human Servs. v. Sepulveda*, 668 S.W.3d 856, 867 (Tex. App.—El Paso 2023, no pet.). OCCC may meet its burden of production by producing evidence of s subjective reason for not promoting Polk, "only if [it] articulates a clear and reasonably specific basis for its subjective assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007); *see Clifton v. City of Pasadena*, No. 14-23-00143-

CV, 2024 WL 2206056, at *8 (Tex. App.—Houston [14th Dist.] May 16, 2024, no pet. h.) (mem. op.) ("When giving a non-discriminatory reason for an employment action, an employer can provide a subjective reason.").

If OCCC meets its burden by producing evidence of a legitimate, nondiscriminatory reason for not promoting Polk in May 2015, the burden shifts back to Polk to come forward with sufficient evidence to raise a genuine issue of material fact on the question of whether OCCC's stated reason is a pretext for discrimination. *Sepulveda*, 668 S.W.3d at 864. Polk can show pretext by establishing "either that he was clearly better qualified than the employee who was selected or that the employer's proffered explanation for its decision was false or unworthy of credence." *Id.* at 868; *see also Nash v. Blood & Tissue Ctr. of Cent. Tex.*, No. 03-03-00763-CV, 2004 WL 2900483, at *4 (Tex. App.—Austin Dec. 16, 2004, no pet.) ("To establish a fact question on the issue of pretext, the nonmovant must present evidence indicating that the nondiscriminatory reason given by the employer is false or not credible, and that the real reason for the employment action was unlawful discrimination.") (emphasis omitted). Polk may show that OCCC's proffered reason is false by "revealing weaknesses, implausibilities, inconsistencies, or contradictions that a fact finder could find unworthy of credence." *Flores*, 576 S.W.3d at 794 (citing *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1198); *see generally Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is

unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

**B.    Analysis**

OCCC argues that Polk did not establish a prima facie case for his failure-to-promote claim because to be promoted to Financial Examiner II, an examiner must be recommended for the promotion by his supervisor.  This recommendation is one of four qualifications necessary for promotion.  Because Polk's supervisor, Dow, did not recommend Polk for promotion to Financial Examiner II in May 2015, OCCC argues Polk was not qualified for the promotion at that time.[13]  OCCC further argues that even if Polk had established a prima facie case of race discrimination, the trial court was nevertheless correct in granting OCCC's Plea because OCCC produced evidence of a legitimate, non-discriminatory reason for not promoting Polk in May 2015, and Polk failed to establish that OCCC's objective reasons for not promoting him in May 2015 are false and pretextual.

Polk argues he was qualified for promotion to Financial Examiner II in May 2015, and the only "qualification" he lacked for the promotion was the discriminatory act itself--the lack of a recommendation from his supervisor, Dow.  According to Polk, OCCC failed to meet its burden to produce evidence of a

---

[13]    OCCC's Plea was based on the second element of Polk's failure to promote claim—that he was qualified for the position.  OCCC did not dispute the first, third or fourth element of Polk's prima facie case.

legitimate, non-discriminatory reason for denying Polk the promotion in May 2015 because Vargas's affidavit and Dow's memoranda were inadmissible. But as we have already concluded, Polk failed to preserve his objections to Vargas's affidavit and Dow's memoranda because he did not secure rulings on his objections. We thus consider Vargas's affidavit and Dow's memoranda in our analysis.

Polk argues that even if we consider Vargas's affidavit and Dow's memoranda, OCCC nevertheless failed to meet its burden of production because Dow's statements that he did not promote Polk in May 2015 because he felt " [Polk] needed more experience" and he was not confident Polk could do the more complicated work required of a Financial Examiner II are "too nebulous to rebut Mr. Polk's prima facie case." *See Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) ("[T]o rebut an employee's *prima facie* case, a defendant employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee."). Polk further argues that even if OCCC met its burden to produce evidence of a legitimate, non-discriminatory reason for denying Polk the promotion in May 2015, Dow's claim that he did not recommend Polk for a promotion in May 2015 because he wanted Polk to pass his qualification tests on the first try is false and a pretext for discrimination because OCCC does not require examiners to pass a test on the first try and "a subjective requirement that is not tethered to any actual rules or policies is inherently unworthy of credence."

Assuming Polk met his burden to establish a prima facie case for his failure to promote claim based on racial discrimination, the burden shifted to OCCC to produce evidence of a legitimate, nondiscriminatory reason for not promoting Polk in May 2015. OCCC offered a memorandum from Polk's supervisor, Dow, where Dow explained the reasons for not recommending Polk for promotion in May 2015. In Dow's November 3, 2015 memorandum entitled, "Ernest Polk – Assessment of Capabilities at May 16, 2015," Dow explained that on May 16, 2015, Polk became eligible for consideration for promotion to Financial Examiner II. Dow stated that his "main concerns with going forward with a recommendation for [Polk's] promotion were listed in his Performance Evaluation [of Polk] for the period end[ing] April 30, 2015." Dow stated that based on Polk's past test scores, Dow was not convinced that Polk could handle the "complexity and intricacies of Chapter 348 calculations," which were part of a Financial Examiner II's responsibilities. According to Dow, Polk failed his initial examiner training test with a score of 56% and when Polk retook the test, he passed with a score of 86.28%. Dow stated that Polk scored 64% on the test administered during the examiner conference in September 2014.

In Polk's Performance Evaluation for the period ending April 30, 2015, Dow stated, "Although Mr. Polk subsequently passed his initial Examiner training with a score of 86.28%, he will need to pass all future tests on the first try in order to be

considered for promotions." According to Dow, Polk scored 86% on the next test, given at the September 2015 conference. Dow stated that as of November 3, 2015, Polk had demonstrated he was capable of performing the duties of a Financial Examiner II and should be promoted to the position.

In Dow's "Promotion Memo for Examiner Ernest Polk — November 4, 2015," Dow stated that Polk "scored 56.00% on the test covering his initial Examiner training at OCCC" and he was "permitted to re-take the initial test and scored 86.28%." Dow stated that Polk then "scored 64.00% on the test given at the 2014 Examiner training conference" and "86.00% on the test given at the Examiner training conference" in September 2015. Dow stated that Polk was "currently in training for [Chapter] 348 independent work," and Dow believed that Polk would "be able to successfully complete the Chap[ter] 348 training within the next four to six months." Dow concluded by stating, "Based on his completion of all the steps required by the OCCC Career Ladder in effect on November 4, 2015, I am recommending [Polk's] promotion to Financial Examiner II." Dow thus provided a sufficiently specific and detailed explanation for not recommending Polk for a promotion in May 2015. *See Alvarado*, 492 F.3d at 616 (requiring employer to "articulate[] a clear and reasonably specific basis for its subjective assessment"); *see also Clifton*, 2024 WL 2206056, at *8 ("When giving a non-discriminatory reason for an employment action, an employer can provide a subjective reason.").

Because OCCC met its burden to produce evidence of a legitimate, non-discriminatory reason for not recommending Polk for promotion to Financial Examiner II in May 2015, the burden shifted back to Polk to show that OCCC's reason was a pretext for racial discrimination. Polk argues that Dow's explanation that he wanted Polk to pass his qualification tests on the first try before recommending him for promotion is false and a pretext for discrimination because OCCC does not require examiners to pass a test on the first try and "a subjective requirement that is not tethered to any actual rules or policies is inherently unworthy of credence." Polk argues that he presented evidence sufficient to create a fact issue as to pretext because he stated in his declaration that African American examiners complained about racial discrimination, most African American examiners left OCCC in a short time, there was a persistent problem with late grade promotions for African American examiners, and Polk was given vague excuses about not being ready for the position of Financial Examiner II. Polk argues that in light of these facts, Dow's reason for not promoting Polk in May 2015 is not worthy of credence.

Polk argues that the discriminatory conduct at issue is Dow's failure to recommend him for the promotion in May 2015. However, Polk does not point to any evidence of discriminatory animus on Dow's part or identify any evidence that race was a motivating factor behind Dow's decision not to recommend Polk for a promotion in May 2015. In particular, there is no evidence Dow supervised the other

unnamed African American examiners in the Houston office whose promotions Polk asserts were delayed, that Dow supervised the White examiners in other offices Polk contends were "promoted on the regular schedule," or that the promotions of the unnamed African American examiners in the Houston office were delayed because Dow did not recommend them for a promotion, much less Dow's purported reason for not recommending them for a promotion. There is also no evidence of the test scores for the other examiners who were recommended for a promotion to Financial Examiner II.

Conversely, OCCC presented evidence that underscores Polk's claims of pretext. When OCCC hired Polk, it also hired four other examiners: three African American examiners, and one Hispanic examiner. OCCC promoted all five examiners to Financial Examiner II at different times in 2015 based on identical criteria: (1) two African American peers were promoted in June 2015, and (2) the Hispanic peer was promoted in May 2015. Only Polk and another examiner's promotion were delayed due to performance concerns, and both were promoted in November 2015.

Polk has thus failed to bring forth sufficient evidence raising a question of fact as to whether racial discrimination was a motivating factor behind Dow's decision not to recommend him for a promotion in May 2015. *See Nash*, 2004 WL 2900483, at *4 ("To establish a fact question on the issue of pretext, the nonmovant must

present evidence indicating that the nondiscriminatory reason given by the employer is false or not credible, and that the real reason for the employment action was unlawful discrimination.") (emphasis omitted). There is also no evidence from which a factfinder could find that Dow's reason for not recommending Polk for a promotion in May 2015—Dow's concern that Polk was not able to perform the complicated calculations required of a Financial Examiner II based on Polk's previous test scores—was false or unworthy of credence. *See Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 528 (5th Cir. 2022) ("The lack of evidence of a meaningful assessment process alone does not prove that Apache discriminated against Gosby."); *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 882 (5th Cir. 2003) ("The mere fact that an employer uses subjective criteria is not . . . sufficient evidence of pretext."); *see generally Phillips v. Amoco Oil Co.*, No. G 80 121, 1982 WL 231, at *3 (S.D. Tex. Mar. 29, 1982) ("Concern over plaintiff's ability to learn required materials was a legitimate, non-discriminatory basis for the employment decision.").

Furthermore, Polk's vague statements that other African American examiners "complained about racial discrimination" and that he told OCCC's upper management that "there appeared to be a racial difference" associated with the "promotion issues" are insufficient to raise a question of fact with respect to pretext. *See Lowery v. Univ. of Hous.—Clear Lake*, 82 F. Supp. 2d 689, 696 (S.D. Tex. 2000)

("Speculation and belief are insufficient to create a fact issue as to pretext, and pretext cannot be established by mere conclusory statements of a plaintiff who feels that she has been discriminated against."); *Greathouse v. Alvin Indep. Sch. Dist.*, 17 S.W.3d 419, 425 (Tex. App.—Houston [1st Dist.] 2000, no pet.) ("Summary judgment for the defendant is proper when a plaintiff claiming race discrimination presents only conclusory allegations, improbable inferences, unsupportable speculation, or subjective beliefs and feelings.").

We overrule Polk's second issue.

**Hostile Work Environment Based on Racial Harassment**

In his third issue, Polk argues the trial court erred by granting OCCC's Plea with respect to Polk's hostile work environment claim based on race because OCCC only addressed the claim in a single sentence in a footnote in its Plea to the Jurisdiction and failed to show that it was entitled to relief on Polk's hostile work environment claim.

OCCC argues that, to the extent Polk attempted to raise a separate claim for hostile work environment claim based on race, it was unnecessary for OCCC to anticipate or respond to the claim because Polk did not include this claim in his February 2016 or May 2018 charge of discrimination. According to OCCC, Polk failed to exhaust his administrative remedies with respect to his hostile work

environment claim, and even if his claim were not barred, Polk failed to establish a prima facie case for this claim.

## A. Applicable Law

A hostile work environment claim "entails ongoing harassment, based on the plaintiff's protected characteristic, so sufficiently severe or pervasive that it has altered the conditions of employment and created an abusive working environment." *Anderson v. Hous. Cmty. Coll. Sys.*, 458 S.W.3d at 646 (quoting *Bartosh*, 259 S.W.3d at 324). To establish a prima facie case of hostile work environment an employee must establish (1) he belongs to a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment complained of was based on a protected characteristic, (4) the harassment complained of affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Id.* If the employee complains of harassment by a supervisor, the employee need only prove the first four elements. *Id.*

To satisfy the fourth element of a hostile work environment claim, the employee must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to create a hostile or abusive working environment." *Donaldson*, 495 S.W.3d at 445. The work environment must be both objectively and subjectively offensive—"one that a

reasonable person would find hostile or abusive and one that the victim perceived to be so." *Id.* Although the "abusiveness" standard does not necessarily require "any tangible psychological impact on the victim," it does require "extreme conduct." *Twigland Fashions, Ltd. v. Miller*, 335 S.W.3d 206, 219 (Tex. App.—Austin 2010, no pet.). Incidental or occasional race-based comments, discourtesy, rudeness, or isolated incidents (unless those incidents are "extremely serious") "are not discriminatory changes in the terms and conditions of a worker's employment." *Univ. of Tex. Health Sci. Ctr. at Tyler v. Nawab*, 528 S.W.3d 631, 641 (Tex. App.—Texarkana 2017, pet. denied). "The availability of a hostile work environment claim is intended to prohibit and prevent conduct that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace." *City of Hous. v. Fletcher*, 166 S.W.3d 479, 490 (Tex. App.—Eastland 2005, pet. denied) (quotations omitted); *see also Harris Cnty. Hosp. Dist. v. Parker*, 484 S.W.3d 182, 197 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (explaining high requirements for hostile work environment claim, including requirement that "[c]onduct must be extreme to amount to a change in the terms and conditions of employment").

## B.    Analysis

In his declaration, Polk stated that after he filed a charge of discrimination in February 2016, he "began to experience petty harassment on a regular basis." According to Polk,

> OCCC had been preparing to feature me in an "employee spotlight," but I was removed without explanation shortly after filing the charge. My supervisors challenged my decision to change hotels in Beaumont. I explained that his original hotel was in an area known for racial discrimination and that I had witnessed racial slurs at that hotel. Afterwards, I had to write "exception safety community conditions" on my vouchers. In fact, management regularly sent black examiners, including me, to "sundown towns" (*i.e.*, towns where it was not safe to be black after sundown). Management would become hostile when I insisted on staying in hotels in safer areas. Later, I protested the discussion of "Texas Heroes" during the Civil War in the OCCC newsletter and explained that it was insensitive to racial discrimination and slavery. OCCC put the "Texas Heroes" section back into the newsletter and left it there for three months. In sum, there were many incidents of petty harassment and abuse directed at me and the other African American examiners. Over time, many of them just quit and moved on to other jobs. I stayed working at OCCC but remained outspoken about the racial disparities that I observed.

Such "petty harassment," however, is not sufficiently severe or pervasive enough to create a hostile work environment. *See Brantley*, 558 S.W.3d at 757–58 (holding allegations employee was "falsely accused of disrespectful behavior and mistakes," called racial slur, told that female employees were afraid of him because he was "tall, Black and bald," told he might be shot if he wore hooded sweatshirt, was paid less than white, female employees, and was "stripped of his duties" were not objectively severe or pervasive enough to affect term, condition, or privilege of employment); *Parker*, 484 S.W.3d at 198 (concluding plaintiff's allegations that his manager told another employee that "black males don't—don't work" and plaintiff was "just here to sit on the clock," coupled with allegations that plaintiff was blamed for problems unrelated to his performance, was required to "improperly write up"

employees, was "badgered about attendance and tardiness," was "screamed and yelled at" in front of employees, was "written up for poor performance," had performance evaluation lowered, and "was scrutinized, micro-managed and constantly criticized" was not extreme and did not affect terms and conditions of employment); *see also Pickens v. Shell Tech. Ventures, Inc.*, 118 Fed. App'x. 842, 850 (5th Cir. 2004) (holding racially insensitive comments made to employee and company Christmas party where characters in blackface performed skit did not create hostile work environment).

Thus, even assuming Polk exhausted his administrative remedies for his hostile work environment claim, Polk failed to establish a prima facie case that the alleged racial harassment was so "severe or pervasive" and "extreme" that it affected a term, condition, or privilege of Polk's employment. *See Donaldson*, 495 S.W.3d at 445 (stating that to establish prima facie hostile work environment claim employee must show workplace was "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to create a hostile or abusive working environment").

The trial court thus did not err in granting OCCC's Plea to the Jurisdiction on Polk's hostile work environment claim based on race. *See Anderson*, 458 S.W.3d at 646.

We overrule Polk's third issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.